JUDGE CARTER

26 CV 06681

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ANONYMOUS,

        Plaintiff,

-against-

McDERMOTT WILL & SCHULTE LLP (f/k/a
McDERMOTT WILL & EMERY LLP), as successor
to SCHULTE ROTH & ZABEL LLP;
SCHULTE ROTH & ZABEL LLP;
HARRY S. DAVIS, in his individual capacity;
SHANNON B. WOLF, in her individual capacity;
and THE CLERK OF THE COUNTY OF NEW
YORK, in his or her official capacity,

        Defendants.

Civil Action No. _____

**VERIFIED COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF AND
DAMAGES UNDER 42 U.S.C. §§
1983 AND 1985**

**JURY TRIAL DEMANDED**

---

## PRELIMINARY STATEMENT

1. Plaintiff, a United States citizen proceeding anonymously, brings this action under 42 U.S.C. §§ 1983 and 1985 to vindicate the First and Fourteenth Amendment rights that secure her own and the public's access to judicial proceedings. Since March 19, 2025, for more than sixteen consecutive months as of this filing, an entire civil action in the Supreme Court of the State of New York, New York County, has been closed to the public in full: every pleading, every motion, every exhibit, every transcript, every order. The sealed action names George Soros, major law firms, and the Trustees of Columbia University, a private university receiving substantial federal financial assistance, and presents allegations of physical violence, sexual violence, sexual blackmail, retaliatory litigation by and on behalf of George Soros, and institutional misconduct. The closure rested first on a temporary, ex parte order entered without any of the findings New York law requires, and, since February 27, 2026, when the state court ruled that its dispositive decisions "terminate[] any temporary sealing in effect in this case," on nothing at all. Court personnel have

enforced the seal anyway. Plaintiff, a rape survivor, was refused the transcript of her own hearing, after the seal's own termination, on the ground that her own case remained sealed. Behind that seal, motions capable of ending the case have been briefed, argued, and decided in the dark. This action seeks to end that continuing deprivation and to recover damages from the private parties whose alleged joint action with a state judicial officer procured it.

2.    What the seal conceals, at its core, is the alleged deliberate use of a woman's rape, her naked body, her psychiatric fragility, and her identity as a rape survivor as weapons of coercion, a sequence alleged in the Underlying State Action and pleaded in detail at paragraphs 27.1 through 27.7 below. The sealed record documents each step in police records, hospital records, the university's own writings, sworn admissions, and the parties' own correspondence. Among them is the admission of William D. Zabel, a founding partner of Schulte Roth & Zabel LLP, the same firm whose attorneys procured the ex parte seal described below, and counsel to Soros. Asked under oath whether he had told the attorney who prosecuted the retaliatory lawsuit that, if the attorney "were to receive no monies," Zabel's firm "would refer him more cases in the future to compensate for him working on a case for which he might get nothing," Zabel answered: "Yes." That record, and not any interest of Plaintiff's, is what the seal has kept from the public.

3.    The seal was procured in a single day, outside ordinary process, as pleaded in detail at paragraphs 29 through 42 below. At 7:00 a.m. on March 19, 2025, Defendant Harry S. Davis, Schulte Roth & Zabel LLP's General Counsel and himself a named defendant in the Underlying State Action, filed an "Affirmation of Urgency" expressly requesting ex parte sealing relief; the asserted emergency was that Plaintiff might publicly file her own complaint. Defendant Shannon B. Wolf signed and submitted the proposed order, executed the EF-7 notification that operationalized the seal, and, upon information and belief, physically delivered the papers to chambers. The prior justice's recusal was filed at 1:01 p.m. That evening, after business hours,

2

before Justice Alexander M. Tisch was recorded on the public docket as assigned, Justice Tisch signed the order, and by 6:38 p.m. Defendant Wolf had filed the notification implementing it, annexing the executed order. The order was undated, reciting only that "sufficient cause" had been alleged, and containing none of the findings 22 NYCRR § 216.1 requires. No permanent sealing order was ever entered.

4. Justice Tisch presided over the sealing application, and over a motion to disqualify the very firms involved, without disclosing his social relationship with Michael J. Roberts: a named defendant, the attorney who had prosecuted the retaliatory lawsuit described above, and a man Schulte's founding partner described under oath as "a very good friend of some of my partners." He recused himself two days after Roberts personally appeared at the May 7, 2025 argument, expressly invoking the "appearance of impropriety that my impartiality might be questioned because of this relationship." Every ruling he made in the case, including entry of the seal itself, preceded that disclosure.

5. The seal's own terms set its endpoint, and the endpoint kept moving. At the May 7, 2025 hearing to which the ex parte order was expressly limited, counsel for George Soros, Casey E. Donnelly of Willkie Farr & Gallagher LLP, asked that the case remain sealed "only until Your Honor decides Mr. Soros' motion to dismiss," because "we know what the headlines will be and that is a bell that cannot be unrung." That motion was granted, and the court expressly terminated any temporary sealing. Soros's counsel then asked that the docket remain closed until every remaining defendant's dismissal motion was resolved, or permanently. The promised endpoint moved each time it arrived; the secrecy remained. That is the interest the seal has served: not privacy, not safety, not any interest the Constitution recognizes, the avoidance of unfavorable headlines for a prominent litigant.

3

6. Plaintiff's identity was already protected by an anonymous caption before the blanket seal was ever sought, and Plaintiff never supported the sealing of the action; she has opposed it from the beginning and has litigated to remove it since April 2025. Any legitimate privacy interest could have been protected through targeted redactions, document-specific sealing, or in camera review; what was closed instead was everything.

7. The chronology supplies the motive. Plaintiff transmitted her draft complaint to defense counsel on March 18, 2025; the Affirmation of Urgency followed at 7:00 a.m. the next morning, filed by the firm's General Counsel, himself a named defendant. A pseudonymous caption already protected Plaintiff's identity without closing a single page. What the blanket seal protected was the record described above, closed to the press, to prospective counsel, and to the public at the precise moment those it implicated were moving to dismiss the case that contained it.

8. On February 27, 2026, the state trial court ruled that its dispositive decisions "terminate[] any temporary sealing in effect in this case," and denied as moot the only application ever made to extend the seal, brought on behalf of Soros himself. Notice of entry was served on every party on March 13, 2026; the County Clerk's office confirmed in writing that only a directive to the Clerk remained to effectuate public access. Nothing followed. Months later, court personnel refused Plaintiff, a party, the transcript of her own July 2, 2025 hearing, on the stated ground that her own case remained sealed.

9. Plaintiff exhausted every avenue the state system offered. Her April 2025 emergency application to the Appellate Division, First Department, was denied on May 13, 2025, and clarification was denied on July 17, 2025, both orders themselves marked SEALED. Throughout, motions capable of terminating the case were briefed, argued, and decided while the public docket showed nothing at all.

4

10. The resulting injury is concrete, present, and continuing. The seal has prevented prospective counsel from reviewing the docket, including a nationally prominent litigator and forty-year Harvard Law School professor who declined to examine the papers because of the sealing order. It has forced Plaintiff to litigate sprawling, multi-defendant motion practice pro se against institutional defendants represented by dozens of attorneys, stripped of the press scrutiny, counsel attention, and public accountability that ordinarily attach to civil litigation. The seal has not merely hidden the litigation; it has altered the conditions under which it is conducted.

11. The stakes are not confined to constitutional principle. At the July 2, 2025 argument, Plaintiff told the court, on the record, that she believed her life was in danger; that it would be convenient for something to happen to her while the case remained hidden from public view; and that she had received death threats and reported them to the Federal Bureau of Investigation. The court had already granted her May 7, 2025 request that her address be kept confidential. Public visibility of judicial proceedings is itself a form of protection; the seal strips that protection away.

12. This action does not ask this Court to sit in appellate review of the March 19, 2025 sealing order, and it does not ask this Court to adjudicate the merits of the Underlying State Action. The sealed allegations are recounted for one purpose: to establish the public interest in access to this record, the motive for its closure, and the injury its continued closure inflicts. The present injury arises from a distinct and later event, the continued administrative enforcement of sealed-docket restrictions after the state court expressly terminated the seal. The prospective relief requested would implement the state court's own termination ruling, not review, reverse, or reject it.

13. Nor does any doctrine of immunity stand between Plaintiff and the relief sought. Plaintiff seeks no relief from Justice Tisch. Judicial immunity is the judge's alone; it is not a shield

that private parties may borrow. It does not immunize private parties alleged to have jointly participated with a state judicial officer in procuring and operationalizing a constitutional deprivation, and it does not bar prospective official-capacity relief against the ministerial official who is enforcing, today, a sealed-docket restriction that no operative order supports.

14. Public access to the courts is not a courtesy extended to litigants; it is a constitutional command. Closure is not a remedy for allegations that prominent defendants would prefer the public never read. And a seal cannot lawfully outlive the order that authorized it. This one has, by nearly five months, and counting, enforced by no judicial command, only by administrative inertia.

15. Plaintiff therefore seeks declaratory and prospective injunctive relief directing the appropriate ministerial official to terminate the continued enforcement of the sealed designation and restore public access to the Underlying State Action, subject only to narrowly tailored protections for legitimately intimate or identifying materials, together with damages from the private Defendants based upon their alleged joint participation with a state judicial officer in procuring and operationalizing the constitutional deprivation.

15.1.   This action proceeds on two distinct forms of relief against two distinct categories of defendants, resting on two distinct factual predicates. Plaintiff seeks prospective declaratory and injunctive relief against Defendant Clerk because the docket remains sealed after the state court terminated the seal; Plaintiff does not allege that the Clerk conspired or acted in concert with the private Defendants. Plaintiff seeks damages against Defendants McDermott Will & Schulte LLP, Schulte Roth & Zabel LLP, Harry S. Davis, and Shannon B. Wolf because they are alleged to have acted jointly with Justice Tisch, not with the Clerk, in procuring, presenting, implementing, and operationalizing the seal that caused the constitutional injury. The Clerk is sued to end the

continuing access deprivation; the private Defendants are sued for the damages their alleged joint participation with a state judicial officer caused.

## JURISDICTION AND VENUE

16. This Court has subject-matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, including 42 U.S.C. §§ 1983 and 1985, and pursuant to 28 U.S.C. §§ 1343(a)(3) and 1343(a)(4) because Plaintiff seeks to redress the deprivation, under color of state law, of rights secured by the Constitution and Acts of Congress providing for the protection of civil rights.

17. Plaintiff seeks prospective declaratory and injunctive relief authorized by 42 U.S.C. § 1983 to remedy ongoing violations of the First and Fourteenth Amendments. Section 1983 constitutes an expressly authorized exception to the Anti-Injunction Act, 28 U.S.C. § 2283, where otherwise applicable. *Mitchum v. Foster*, 407 U.S. 225 (1972). In any event, Plaintiff does not seek to stay the Underlying State Action or to interfere with the adjudication of its merits; she seeks only prospective relief ending the ministerial enforcement of a sealed-docket designation after the state court itself terminated the seal.

## THIS ACTION DOES NOT SEEK APPELLATE REVIEW OF ANY STATE-COURT JUDGMENT

18. Plaintiff does not seek appellate review or reversal of any final state-court judgment. Rather, Plaintiff seeks relief for independent and continuing constitutional injuries allegedly caused by Defendants' conduct under color of state law, including the continued enforcement of the challenged sealing order. Plaintiff does not ask this Court to review, reverse, vacate, or modify the March 19, 2025 sealing order or any other order of the state courts. The state court itself terminated

7

the seal on February 27, 2026. Plaintiff's claims are directed to what has happened since: the continued ministerial enforcement of sealed-docket restrictions that no operative order supports; the denial to Plaintiff, on asserted sealing grounds, of the transcript of her own July 2, 2025 hearing; and the continuing effects of a seal the private Defendants allegedly procured and operationalized through joint action with Justice Tisch. Adjudicating the damages claims against the private Defendants requires no review of any state-court order; those claims concern the private Defendants' own alleged conduct in procuring and operationalizing the deprivation. See Sykes v. Mel S. Harris & Associates LLC, 780 F.3d 70, 94–95 (2d Cir. 2015). The relief sought would implement, not overturn, the state court's own termination of the seal. This action accordingly falls outside the Rooker-Feldman doctrine, which the Supreme Court has recently reaffirmed is narrow and bars only suits by state-court losers complaining of injuries caused by state-court judgments and seeking federal review and rejection of those judgments. T.M. v. University of Maryland Medical System Corp., 608 U.S. ___ (2026) (No. 25-197, decided June 18, 2026). Plaintiff seeks no review and no rejection of any state-court judgment; she seeks an end to the enforcement of a seal that the state court has already ended. Even if the March 19, 2025 sealing order were assumed valid when entered, it could not authorize enforcement after the state court terminated the seal; the injury pleaded here is caused by the post-termination refusal to restore access, not by the March 19, 2025 order itself.

## THIS ACTION DOES NOT WARRANT ABSTENTION

18.1.  Nor is abstention warranted. Plaintiff does not ask this Court to stay the Underlying State Action, to supervise its merits, to control its motion practice, to review any state-court judgment, or to adjudicate her pending state-court request for the July 2, 2025 transcript. She seeks prospective relief ending the continued administrative enforcement of a sealed-docket restriction

after the state court terminated the seal. The requested relief would implement the state court's own termination order; it would not impair the state court's ability to adjudicate the merits of the Underlying State Action. Younger abstention is confined to exceptional categories of cases, none of which is presented here. Sprint Communications, Inc. v. Jacobs, 571 U.S. 69, 78 (2013). On July 15, 2026, Plaintiff commenced an original special proceeding pursuant to CPLR Article 78 in the Appellate Division, First Department, seeking only (i) mandamus compelling ministerial implementation of the February 27, 2026 termination order through issuance of a directive to the County Clerk, and (ii) mandamus compelling a disposition, not any particular disposition, of applications pending undecided in the Underlying State Action. The Appellate Division has referred that petition to a full panel and calendared it for the September 2026 Term. That proceeding neither raises nor can resolve the federal constitutional claims asserted here; it adjudicates no party's substantive rights; and it affords no forum for the damages claims pleaded against the private Defendants, which no Article 78 proceeding can award. Its pendency is accordingly no basis for abstention.

18.2. Nor does the closure at issue fall within the category of orders committed uniquely to the state courts' management of their own proceedings. Plaintiff does not ask this Court to decide whether the Underlying State Action should be sealed, to substitute its judgment for the state court's on that question, or to intervene in any application in which that question remains open for decision. The state court has decided it: on February 27, 2026 it ruled that its dispositive decisions terminate any temporary sealing in effect in the case, and the Office of the County Clerk thereafter confirmed in writing that only a directive to the Clerk remained to effectuate public access. NYSCEF Doc. Nos. 433, 436. No state proceeding is pending in which the sealing of this docket remains open to determination; the Article 78 proceeding asks only that the ministerial step the state court's own ruling requires be compelled. What continues is the administrative

9

enforcement of a designation that no operative order supports. Relief directed to that enforcement vindicates the state court's determination rather than displacing it, and it intrudes upon no function the state courts have reserved to themselves.

19. Venue is proper in this District pursuant to **28 U.S.C. § 1391(b)(2)** because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred within this District. The Underlying State Action is pending in New York County, the challenged sealing order was entered in New York County, and the acts and omissions alleged herein occurred principally within this District.

## STANDING AND REDRESSABILITY

19.1.    Plaintiff has suffered, and continues to suffer, a concrete and particularized injury: the docket of the Underlying State Action remains inaccessible to Plaintiff's prospective counsel, the press, and the public; Plaintiff cannot direct prospective counsel to an accessible public record; and court personnel have denied Plaintiff the transcript of her own hearing on the asserted ground that the case remains sealed.

19.2.    That injury is fairly traceable to the continued ministerial enforcement of sealed-access restrictions after the state court's February 27, 2026 termination order. And it is redressable by this Court: Defendant Clerk possesses the administrative capacity to remove the sealed designation on NYSCEF, restore public access to the docket, and implement the termination order, as the Clerk's own office confirmed in writing that only a direct court directive to the Clerk remained to effectuate unsealing. NYSCEF Doc. No. 436.

19.3.    Plaintiff seeks no damages from the Clerk. She seeks only prospective declaratory and injunctive relief to end an ongoing violation of federal law, relief within this Court's authority under 42 U.S.C. § 1983 and Ex parte Young, 209 U.S. 123 (1908).

## PARTIES AND RELEVANT NONPARTIES

20. Plaintiff is a natural person and a citizen of the United States, proceeding under a pseudonym. She is the plaintiff in the action captioned *Anonymous v. George Soros, et al.*, Supreme Court of the State of New York, New York County, Index No. 152536/2025 (the "Underlying State Action"). Plaintiff was granted leave to proceed anonymously in that action and contemporaneously seeks leave to proceed under the same pseudonym in this action because it concerns the same underlying allegations and the same privacy interests.

21. Hon. Alexander M. Tisch is, and at all relevant times was, a Justice of the Supreme Court of the State of New York. Justice Tisch is not named as a defendant in this action, and no relief is sought against him. His conduct is alleged herein because the challenged seal was entered and maintained through his judicial office and because Plaintiff alleges that the private Defendants jointly participated with him, under color of state law, in procuring, implementing, and operationalizing the challenged seal. At all relevant times, Justice Tisch acted under color of state law within the meaning of 42 U.S.C. § 1983.

22. Defendant McDermott Will & Schulte LLP (formerly McDermott Will & Emery LLP) is a global law firm with offices in this District. On or about August 1, 2025, McDermott Will & Emery LLP and Schulte Roth & Zabel LLP completed a merger, forming the combined firm McDermott Will & Schulte LLP. The combined firm retained the Schulte name as part of its own, and legacy Schulte Roth & Zabel partners assumed leadership positions in the combined firm, including seats on its management and compensation committees and roles co-leading its New

York office. Upon information and belief, the equity partners of Schulte Roth & Zabel LLP became partners of the combined firm and hold partnership interests in it; the ownership of the predecessor firm thus carried forward into the combined firm rather than being bought out or extinguished. What those partners hold in the combined firm is an ownership interest in the firm itself, and not merely a contractual entitlement to a share of its future profits. That continuity of ownership is alleged in support of each of the theories pleaded below, including both de facto merger and mere continuation, each of which turns upon it. By virtue of that merger, McDermott Will & Schulte LLP is the successor in interest to, and a mere continuation of, Schulte Roth & Zabel LLP, and is liable for the conduct of Schulte Roth & Zabel LLP and its partners alleged herein, including conduct that occurred during that firm's representation of defendants in the State Action. Plaintiff alleges that McDermott Will & Schulte LLP is liable as the successor to Schulte Roth & Zabel LLP under applicable principles of successor liability.

22.1.    Schulte Roth & Zabel LLP's own liability, to which McDermott Will & Schulte LLP succeeds, is not premised on respondeat superior. At all relevant times, Defendant Davis was the General Counsel of Schulte Roth & Zabel LLP and, upon information and belief, possessed final decision-making authority for the firm with respect to legal action taken by the firm on its own behalf, including the decision to seek emergency ex parte sealing relief in an action in which the firm and its personnel were named defendants. Davis exercised that authority in fact: the sealing application was presented on the firm's behalf through his own 7:00 a.m. Affirmation of Urgency, and was drafted, submitted, and operationalized by Defendant Wolf as the firm's counsel of record. The firm thereafter authorized, adopted, and ratified those acts, and accepted and retained the benefit of the seal, never moving to withdraw or dissolve it. The deprivations alleged herein accordingly resulted from the acts of an official possessing final decision-making authority for the firm, and from the firm's own conduct. That ratification was not tacit: when Plaintiff moved to

12

vacate the sealing orders, the firm, on its own behalf and that of its personnel, through its own memorandum of law, defended the seal's continuation by invoking the reputational interests of the Defendants themselves. NYSCEF Doc. No. 90 at 14; see paragraph 47.2 below. That adoption continued after the merger: on August 1, 2025, the merger's effective date, Davis, affirming that "the combined firm is McDermott Will & Schulte LLP," submitted papers in the State Action on behalf of the Schulte Defendants. NYSCEF Doc. No. 426 ¶¶ 1–2.

22.2.    Defendant Schulte Roth & Zabel LLP is a New York limited liability partnership. Its continued existence is not a matter of inference: it is sworn by its own General Counsel, Defendant Davis, in an affirmation filed in the State Action on August 1, 2025, the merger's effective date. Davis affirmed that he "was the General Counsel of Schulte Roth & Zabel LLP until its merger with McDermott Will & Emery LLP, which was effective earlier today (the combined firm is McDermott Will & Schulte LLP)," and that "Schulte continues to exist as an entity notwithstanding the merger. Schulte is now a subsidiary of McDermott Will & Schulte LLP, but Schulte no longer has any attorneys as all former Schulte attorneys are now part of McDermott Will & Schulte LLP." NYSCEF Doc. No. 426 ¶¶ 1, 7. Schulte Roth & Zabel LLP is accordingly sued as the surviving entity whose General Counsel, partners, and counsel of record undertook the conduct alleged herein. McDermott Will & Schulte LLP is sued, in addition and in the alternative, as the entity liable for Schulte Roth & Zabel LLP's obligations by actual merger; by express or implied assumption of its liabilities, including through the combined firm's own request to be substituted for Schulte Roth & Zabel LLP as a defendant in pending litigation; by de facto merger; and as the mere continuation, and parent, of Schulte Roth & Zabel LLP, the combined firm into which every Schulte attorney, the firm's practice, and the Schulte name itself were absorbed. The allocation of the alleged liability between the attorney-less subsidiary and the combined firm that absorbed its attorneys depends on transaction documents and corporate facts peculiarly within Defendants'

13

possession; both entities are before the Court, and the theories are pleaded in the alternative. Plaintiff does not seek double recovery for the same injury. Plaintiff further alleges, in the alternative, that McDermott Will & Schulte LLP is estopped from denying that it is the successor in interest to Schulte Roth & Zabel LLP. The combined firm represented itself to be that successor, in its own court papers, for the purpose of obtaining relief it sought, asking that it be substituted for Schulte Roth & Zabel LLP as a defendant, and identifying itself as the entity that "should replace Schulte as a defendant in this Action and in the caption." ¶ 22.3. Having asked to be treated as the successor when it suited the combined firm to be treated as one, it may not be heard to deny that status now.

22.3.    The combined firm's own position confirms the succession. By letter dated July 28, 2025 to all parties in the State Action, Davis, writing "in [his] capacity as General Counsel of Schulte", stated that "[i]n circumstances such as this, it is customary to substitute the combined firm as a party in any litigation where the prior firms are currently parties," requested the "consent of all parties to substitute McDermott Will & Schulte LLP for Schulte Roth & Zabel LLP as a defendant," and offered to "prepare an appropriate stipulation and order to effectuate the substitution." NYSCEF Doc. No. 423, as quoted at NYSCEF Doc. No. 426 ¶ 3. Plaintiff had already sought the same relief from the court: on July 1, 2025, a month before the merger closed, Plaintiff applied in the State Action to join McDermott Will & Emery LLP as successor in interest to Schulte Roth & Zabel LLP and to amend the caption; the application was declined on July 9, 2025 as "[p]remature." NYSCEF Doc. Nos. 405, 410 (Mot. Seq. 016). The merger had not yet become effective. On July 28, 2025, Plaintiff also transmitted written notice to McDermott Will & Emery LLP's Managing Partner, General Counsel, and named equity partners, identifying Schulte Roth & Zabel LLP as a defendant in the State Action, stating Plaintiff's successor-liability position, and advising that federal claims would follow, including under 42 U.S.C. § 1985 and the

Fourteenth Amendment. When Plaintiff thereafter moved to amend the State Action caption, the Schulte Defendants' response, submitted through Davis on the merger's effective date, identified "McDermott Will & Schulte LLP" as "[t]he legal name of the entity that should replace Schulte as a defendant in this Action and in the caption," and attached a corrected proposed caption. NYSCEF Doc. Nos. 412, 426 ¶ 6 & Ex. A thereto. The combined firm accordingly closed the merger with pre-closing written notice of the claims alleged in the State Action and of Plaintiff's successor-liability position, and, on its first day of existence, took the position in its own court papers that it is the entity that "should replace Schulte as a defendant."

22.4.    Plaintiff pleads successor liability in the alternative under whichever standard governs a federal civil rights claim. The facts alleged at paragraphs 22 through 22.3 establish each element of the alternative standard: the combined firm had written notice of the claims asserted here before the transaction closed; it continued the predecessor's business without interruption, retaining the predecessor's attorneys, clients, and active matters, including the representation of the Schulte Defendants in the Underlying State Action, in which Defendant Davis appeared on the merger's effective date, together with the predecessor's name; and Schulte Roth & Zabel LLP, by its own General Counsel's sworn account, retains no attorneys and exists as a subsidiary of the combined firm, a form in which it does not independently carry on the practice from which the claims alleged herein arose. Upon information and belief, the combined firm also continues to operate from the predecessor firm's own New York offices at 919 Third Avenue, New York, New York, which it maintains as one of its two offices in this City. Plaintiff alleges on that basis that the combined firm is answerable for the predecessor's obligations under the traditional standard, under the alternative standard, or under both.

23. Defendant Harry S. Davis is, and at all relevant times was, a Partner of Schulte Roth & Zabel LLP and the General Counsel of that firm. He is a named defendant in the State Action. He is

15

sued in his individual capacity for joint action with Justice Tisch in procuring the sealing order, including by filing an Affirmation of Urgency at 7:00 A.M. on March 19, 2025 (NYSCEF Doc. No. 39) expressly requesting that the Court issue the sealing order on an ex parte basis.

24. Defendant Shannon B. Wolf was, at all relevant times, a partner of Schulte Roth & Zabel LLP. Plaintiff alleges that Defendant Wolf participated in procuring and implementing the challenged sealing order by preparing and signing the proposed Order to Show Cause, executing the NYSCEF EF-7 sealing notification that operationalized the seal, and, upon information and belief, delivering or causing the sealing papers to be delivered to Justice Tisch's chambers for consideration. On the EF-7 form itself, Wolf identified herself as counsel for the Schulte Defendants, selected and initialed, "SBW", the option "Sealing of Entire File Ordered" rather than identifying any particular documents, designated access as limited to the parties, counsel to the parties, and court personnel, and annexed the executed order bearing the handwritten alterations. NYSCEF Doc. No. 44.

25. Michael J. Roberts is an attorney admitted to practice in New York and a named defendant in the Underlying State Action. Roberts is not named as a defendant in this action, and no relief is sought against him. Plaintiff alleges that Roberts maintained an undisclosed personal relationship with Justice Tisch during the period in which the challenged sealing order was procured and maintained, and that Roberts is a documented personal and professional intimate of Schulte Roth & Zabel partners. Those relationships are alleged as circumstantial evidence bearing on the impartiality of the process by which the seal was obtained and supporting the inference of coordination between the Defendants and Justice Tisch.

26. Defendant Clerk of the County of New York is named solely in an official capacity for purposes of prospective declaratory and injunctive relief. Plaintiff seeks no damages against the

16

Clerk. Plaintiff alleges that the Clerk is the public official responsible for implementing sealing and unsealing directives on the NYSCEF system and that the docket in the Underlying State Action reflects that implementation of the state court's unsealing directive requires action by the Clerk. See NYSCEF Doc. No. 436.

## FACTUAL ALLEGATIONS

### A. The Underlying State Court Action

27. On or about February 28, 2025, Plaintiff commenced the Underlying State Action by filing a Summons with Notice in the New York Supreme Court, New York County. The State Action asserts claims arising from a sustained, multi-year campaign of fraud, retaliation, tortious interference, and coordinated obstruction directed at Plaintiff. The named defendants include George Soros; Schulte Roth & Zabel LLP and several of its partners (including Defendants Davis); Lavely & Singer P.C.; the Trustees of Columbia University; Friedman Kaplan Seiler Adelman & Robbins LLP and Mary E. Mulligan; New York-Presbyterian Hospital; Michael J. Roberts; and several New York media organizations.

27.1.  The Underlying State Action alleged that Plaintiff's 2011 action against George Soros survived dismissal in substantial part in January 2013, including claims arising from Soros's alleged physical violence. It alleged that the retaliatory lawsuit concerning Plaintiff's reported rape was commenced less than two months later: its verified complaint was signed on February 25, 2013, held for three weeks, and filed on March 18, 2013, the day before a previously scheduled preliminary conference in Plaintiff's action against Soros, and it reached the New York Post at approximately 4:00 a.m. that morning, before any pleading existed on any public docket. Within days, the story had been republished internationally.

27.2.    The Underlying State Action alleged that on December 31, 2012, Plaintiff was raped in her Columbia University dormitory in Manhattan; that Plaintiff made no public accusation against her alleged assailant and declined to pursue criminal proceedings principally to protect her privacy; that the report to law enforcement was initiated by a Columbia University staff member, not by Plaintiff; and that on March 11, 2013, seven days before the retaliatory lawsuit was filed, Columbia's Deputy Title IX Coordinator issued a written disposition confirming that fact. The premise on which Plaintiff was branded a woman who had "cried rape" was refuted, in writing, by the university's own records before the lawsuit existed.

27.3.    The Underlying State Action alleged, on the sworn deposition testimony of William D. Zabel, Soros's longtime counsel and a founding name partner of Schulte Roth & Zabel, that Zabel procured attorney Michael J. Roberts to prosecute the retaliatory lawsuit and underwrote the representation with the firm's future business. Asked whether he told Roberts that "if he were to receive no monies for representing Mr. Dubensky, your firm would refer him more cases in the future to compensate for him working on a case for which he might get nothing," Zabel answered: "Yes." (Zabel Dep. 87:19–88:7.) Zabel testified that he spoke with Roberts before the lawsuit was filed and asked him, "When do you plan to do it?", and that the lawsuit "undermined [Plaintiff's] credibility because she apparently made the same false charge of assault that she's made against Mr. Soros." Plaintiff's then-counsel swore that "[b]ut for Mr. Zabel's promise of future referral work to Mr. Roberts, it is highly improbable that Mr. Roberts would have undertaken to represent — on a contingency basis — a case against the penniless [Plaintiff]," and that Zabel's role "in instigating a vexatious litigation that would otherwise never have been brought can fairly be characterized as barratry."

27.4.    The Underlying State Action alleged that the retaliatory lawsuit was designed to brand a rape survivor a false accuser before the public and to operate on her, filing by filing, as an

18

instrument of pressure in the litigation she refused to abandon, and that it was then offered up for recall by a nonparty to it. On November 29, 2013, Soros's agent, attorney Martin Singer, wrote to Plaintiff's counsel that "Mr. Soros will indemnify [Plaintiff] with respect to the Dubensky case and will pay additional sums in excess of the settlement amount provided for in paragraph 1 above to ensure that the Dubensky case is dismissed with prejudice against your client." Soros's own memorandum of law in the sealed action later acknowledged that he had offered Plaintiff $6.75 million to settle her claims against him and that resolution of the retaliatory lawsuit was negotiated as part of that settlement. After Plaintiff's action against Soros was extinguished in 2015 without any adjudication of its merits, the retaliatory lawsuit was discontinued without adjudication.

27.5.    The Underlying State Action alleged that intimate materials, nude or video-derived images of Plaintiff and sexually explicit university records describing her rape, obtained through subpoena, were deployed as instruments of settlement pressure: that Plaintiff's then-attorney displayed a naked image of Plaintiff, read aloud degrading sexual material concerning the rape, and warned that unless she settled her claims against Soros, her life "will be ruined"; that Plaintiff answered that she believed in justice and would not surrender her claims; and that her own attorney replied: "There is no justice." The Underlying State Action alleged that the communication conveyed that, unless she settled her claims against Soros, her rape, her identity, and her intimate materials would continue to be used against her.

27.6.    The Underlying State Action alleged that the campaign's consequences were immediate, documented, and known. Plaintiff's then-attorney swore that the 4:00 a.m. article "crushed [Plaintiff] emotionally"; that the leaks were made "in an effort calculated to cause [Plaintiff] to suffer emotional distress"; and that Plaintiff experienced suicidal ideation "on not fewer than three occasions." Ten days after the pre-filing leak, Plaintiff formally withdrew from her semester at Columbia University. By early 2014, her documented suicidal ideation and

psychiatric treatment were set forth in sworn filings in the very litigation being prosecuted against her, and by decision dated March 10, 2014, a Justice of the Supreme Court acknowledged the danger on the face of the record, noting counsel's "concern regarding her suicidal expressions." The risk was sworn, filed, and acknowledged from the bench. The campaign was pressed anyway.

27.7.    The Underlying State Action placed these events within a documented course of conduct. It alleged a police-documented August 11, 2010 assault by Soros at his Manhattan residence, recorded in a New York City Police Department Domestic Incident Report noting "Pushing" and "Slapping," with photographs of Plaintiff's injuries taken by responding officers, and emergency treatment at Lenox Hill Hospital that same night. Plaintiff swore to the full account of that assault in a verified complaint filed within one year, and the assault-and-battery claim pleaded upon it was sustained by the state trial court in January 2013 and by the Appellate Division, First Department, in April 2014. The Underlying State Action further alleged a February 2014 physical seizure of Plaintiff at a Manhattan deposition. Every document described in this section now sits behind the seal.

28. On March 10, 2025, Hon. Leslie A. Stroth, Justice of the New York Supreme Court, signed an Order to Show Cause permitting Plaintiff to proceed with an anonymous caption, returnable May 16, 2025. NYSCEF Doc. No. 8. Plaintiff's application was supported by a sworn affidavit and a memorandum of law; the operative requests of both sought leave to proceed under an anonymous caption, and neither sought sealing of the docket. NYSCEF Doc. Nos. 3–4.

**B. The Schulte Sealing OSC and Davis's Affirmation of Urgency**

29. On March 17, 2025, Schulte Roth & Zabel LLP, through Defendant Wolf, drafted and submitted to the Court an Order to Show Cause and Temporary Restraining Order Regarding the Filing of Materials Under Seal Pending the May 16, 2025 Hearing (the "Schulte Sealing OSC").

The Schulte Sealing OSC sought to seal the entire docket pending resolution of Plaintiff's anonymity OSC. NYSCEF Doc. No. 27.

30. On March 18, 2025, at 12:59 P.M., Plaintiff sent an email to counsel for Schulte and other defendants enclosing a draft of her Complaint "for your review," describing it as "to be filed imminently at my sole discretion, provided as a courtesy in connection with the pending litigation." NYSCEF Doc. No. 39 ¶ 6.

30.1.    At 1:26 P.M. the same day, Defendant Davis responded in writing. His email stated that the firm had filed the Schulte Sealing OSC "to ensure that all filings in this matter remain under seal pending a hearing and determination of your Order To Show Cause," and acknowledged: "We provided you with a courtesy copy of those papers in advance of filing them and served them on you last night after filing." It characterized Plaintiff's stated intent to file her complaint "on the public record" as an intent "to blatantly disregard the Order to Show Cause filed last night", an order no justice had signed, and stated: "If you do so, we will hold you responsible and will seek both monetary sanctions and terminating sanctions." Plaintiff replied that afternoon, in an email finalized at 2:07 P.M.: the unsigned Order to Show Cause "imposes no legal restraint"; Defendants' opposition to her anonymous caption threatened the unlawful disclosure of a sex-crime victim's identity, invoking New York Civil Rights Law § 50-b; and "Preserve all communications." True copies of that correspondence will be made available to the Court upon request.

30.2.    Plaintiff's written objection was thus in Davis's and Wolf's hands before Davis filed the Affirmation of Urgency at 7:00 A.M. the following morning. At no time before the order was signed did Davis or Wolf notify Plaintiff of the time, date, or place at which the application would be presented, identify the justice who would hear it, invite her to appear, or provide any

method by which her objection could be placed before the deciding justice. The first notice Plaintiff received of an operative restraint was Wolf's service of the signed order by email, after the order had been signed and its implementation begun.

31. The draft complaint transmitted on March 18, 2025 contained allegations concerning, among other things, the circumstances of Plaintiff's reported sexual assault, subsequent litigation allegedly initiated against her, the alleged acquisition and use of Plaintiff's intimate materials, and claims of institutional misconduct involving several of the defendants, including Defendant Davis and his firm.

32. On March 19, 2025 at 7:00 A.M., before ordinary court business hours, before any judicial action had been taken on the Schulte Sealing OSC, and before the prior judge's recusal had been filed on the docket, Defendant Harry S. Davis, a named defendant in the State Action acting both as a defendant and as counsel of record for the Schulte Defendants (including himself), filed an Affirmation of Urgency in support of the Schulte Sealing OSC. NYSCEF Doc. No. 39 (filing time stamp 03/19/2025 07:00 AM).

33. In the Affirmation of Urgency, Defendant Davis explicitly requested that the Court issue the sealing order on an ex parte basis. Davis stated, in relevant part: "this Court should issue an order maintaining the status quo on an ex parte basis until such time as the assigned trial judge is able to assess the unusual circumstances of this matter . . . ." NYSCEF Doc. No. 39 ¶ 11.

34. The Affirmation of Urgency stated that immediate ex parte relief was necessary because Plaintiff might publicly file her Complaint before the Court ruled on the sealing application. Plaintiff alleges that the asserted urgency arose from the prospect that her pleading would become publicly available before the Court acted on the sealing request.

22

35. Paragraph 9 of the Davis Affirmation identifies Plaintiff by reference to her "personal email account" and "her own name" and characterizes her as "a person of dubious credibility, with a history of abusing the court system." NYSCEF Doc. No. 39 ¶ 9. This characterization was filed in a sworn document in a case captioned Anonymous v. George Soros, et al., at a time when Justice Stroth's March 10, 2025 Order permitting anonymous caption (Doc. 8) was in effect.

35.1.    The memorandum of law filed in support of the Schulte Sealing OSC, electronically signed by Defendant Wolf and listing Defendant Davis first among counsel, characterized Plaintiff as seeking to borrow "the credibility of an 'anonymous' woman who has come forward with 'legitimate' claims, including claims of gender-based violence," placing the word "legitimate" in quotation marks. NYSCEF Doc. No. 28 at 3. The same memorandum urged the Court not to permit Plaintiff to "take advantage of a pseudonym, ordinarily reserved for plaintiffs who truly fear for their own physical safety, in order to 'game' a litigation, in the hopes of a cash grab." Id. at 4. These characterizations were directed at a woman whose anticipated pleading asserted claims of gender-based violence.

35.2.    In the same Affirmation of Urgency, Defendant Davis swore that he had "reason to believe that Plaintiff has the assistance of some party or parties acting as counsel without making an appearance," and that "[t]o the extent that Plaintiff is not actually proceeding pro se, but in fact, has counsel hiding behind her, that is all the more reason" for the ex parte relief he sought. NYSCEF Doc. No. 39 ¶ 11. The evidence Davis identified for this sworn assertion was that Plaintiff's responsive order to show cause "was apparently prepared (with legal authorities included) in the period of less than 24 hours." Id. Plaintiff prepared that filing herself. The premise offered to the Court, that a promptly prepared filing citing legal authorities could not be the work of the woman proceeding pro se who signed it, was advanced as a ground for granting relief against her ex parte, without her being heard.

35.3.    On April 14, 2025, in opposition to Plaintiff's request to proceed anonymously, Defendant Davis filed a sworn affirmation annexing, as that affirmation's Exhibit D, "screenshots of Google searches conducted by an associate of Schulte Roth & Zabel LLP under my supervision." NYSCEF Doc. No. 183 ¶ 6. The screenshots record searches run on the evening of April 10, 2025 for the names of defendants and counsel in the Underlying State Action. NYSCEF Doc. No. 187. The results selected for filing consist principally of tabloid coverage characterizing Plaintiff as, among other things, a "Brazilian bombshell," a "South American soap actress," a "Fiery Girlfriend," an "Irate ex-lover," and an "ex-mistress," and reporting that she "goes berserk during deposition." Id. Exhibit D to that affirmation contains no judicial decision or order. The same affirmation separately annexed, as its Exhibit E, the February 13, 2015 judgment dismissing Plaintiff's 2011 action. NYSCEF Doc. No. 183 ¶ 7.

## C. The Stroth Recusal, the Hand-Delivery, and the Same-Day Tisch Sealing Order

35.4.    Davis acted on the premise his affirmation had sworn to. Having attested that the speed and legal competence of Plaintiff's pro se filing evidenced "counsel hiding behind her," Davis thereafter directed the conduct alleged at paragraph 63: a "Preservation Notice" to Plaintiff's male senior paralegal, whose assistance, Plaintiff alleges, consisted of formatting and clerical support, copied to the United States Managing Partner of the paralegal's employer and suggesting that the assistance "may constitute the unauthorized practice of law." The paralegal thereafter ceased assisting Plaintiff. Plaintiff continued to prepare, sign, and file her submissions herself, as she has throughout this action and the Underlying State Action. Plaintiff alleges that this sequence corroborates that the sworn "hidden counsel" premise was not a neutral procedural concern but an expression of the same stereotype reflected in the statements alleged above: that a woman asserting claims of gender-based violence could not herself be the author of competent legal work.

24

36. On March 18, 2025, Justice Stroth executed a "Reason for Recusal (Jud. Law § 9)" form, formally recusing herself from the case, declining to provide a reason and invoking the statutory confidentiality exception. NYSCEF Doc. No. 40.

37. On March 19, 2025 at 1:01 P.M., Justice Stroth's recusal was filed on the NYSCEF docket. Doc. No. 40 (filing time stamp 03/19/2025 01:01 P.M.). Justice Stroth's recusal was filed approximately six hours after Defendant Davis's 7:00 A.M. Affirmation of Urgency requesting ex parte relief.

38. Justice Tisch was not officially recorded on the NYSCEF docket as the assigned judge until March 20, 2025, the day after he signed the sealing order. As of March 19, 2025, when the sealing order was signed, no judge was yet officially recorded on the NYSCEF docket as the assigned justice on the case. An order signed by Hon. Suzanne J. Adams, J.S.C., Part 40, and dated March 19, 2025, directed that "this matter shall be transferred forthwith to Hon. Alexander Tisch." That order was received by NYSCEF and filed on March 20, 2025, at 10:25 A.M. NYSCEF Doc. No. 45. The transfer order thus bears a date one day earlier than its filing; at no time on March 19, 2025 did any assignment of the case to Justice Tisch appear on the public docket, and the sealing order Justice Tisch signed that evening, unlike the transfer order, bears no date at all. The signed sealing order itself was filed onto the docket that same morning at 9:59 A.M. (NYSCEF Doc. No. 42), twenty-six minutes before the transfer order assigning the case to the justice who had signed it.

39. Notwithstanding the absence of any officially recorded assignment, on the evening of March 19, 2025, after ordinary court business hours, Justice Tisch signed the Schulte Sealing OSC. The signed order records no time of signature. The docket records that the signed order was received by NYSCEF on March 19, 2025, uploaded under a court-user account, and was not filed onto the docket by the County Clerk until March 20, 2025. NYSCEF Doc. No. 42 (received

03/19/2025; filed 03/20/2025, 9:59 A.M.). By 6:38 P.M. on March 19, 2025, five hours and thirty-seven minutes after Justice Stroth's recusal hit the docket, Defendant Wolf filed the EF-7 Notification for Sealing, annexing the executed, hand-altered order. NYSCEF Doc. No. 44 (filing time stamp 03/19/2025 06:38 P.M.). The executed order was thus in the drafters' possession, and its implementation under way, before the County Clerk had filed the order itself.

40. Upon information and belief, Defendant Wolf physically delivered, or caused to be delivered, the Schulte Sealing OSC papers to Justice Tisch's chambers and thereafter obtained the signed order. Plaintiff bases this allegation on the sequence of events reflected in the documentary record.

Specifically, Justice Tisch was not reflected on the NYSCEF docket as the assigned justice until the following day, when the Order of Transfer and Reassignment to Hon. Alexander Tisch, dated March 19, 2025 but not filed until March 20, 2025 at 10:25 A.M., was docketed (NYSCEF Doc. No. 45); the EF-7 Notification for Sealing (NYSCEF Doc. No. 44), signed by Defendant Wolf and annexing the executed order, was filed at 6:38 p.m. on March 19, 2025, before the County Clerk had filed the signed order itself onto the docket (NYSCEF Doc. No. 42, received March 19, filed March 20, 2025, at 9:59 A.M., under a court-user account); and Defendant Wolf was the attorney who executed the operational sealing notification, certifying a scope, "Sealing of Entire File Ordered", broader than the signed order's prospective text, as alleged at paragraph 41.1. Plaintiff alleges that these circumstances support the inference that the sealing papers were presented to, and the signed order retrieved from, Justice Tisch's chambers before the order assigning the case to him had been filed or made public, and that Defendants Davis and Wolf, or persons acting at their direction, learned which justice would receive the application through communications not reflected on any public record.

41. The entered sealing order bears Justice Tisch's signature but no date of signature. The "Dated:" line on the order's signature page reads "Dated: New York, New York / March ___, 2025", with both the location and the month stricken, and no replacement date written in by Justice Tisch or any other person. The order also bears handwritten interlineations modifying the prescribed method of service, "by the NYSCEF system" is struck through; service upon Plaintiff is redirected by hand to a specified email address; and service upon the attorneys for the remaining defendants is redirected by hand to "by personal service", together with handwritten dates filling in the operative deadlines ("March 25" for service and "April 25, 2025" for opposition) and a handwritten decretal adding a proof-of-service requirement. Email service upon Plaintiff was the mechanism the Schulte Sealing OSC itself had proposed: its alternative request asked the Court to direct the parties to "effectuate service, by email, on all parties who have appeared in this action, as is permitted under CPLR § 308(5) and CPLR § 2103(b)(7)." NYSCEF Doc. No. 42 ¶ i. CPLR 2219(a) requires that an order determining a motion "state the place and date of its grant or denial." Plaintiff alleges that these circumstances demonstrate the undated signature on the sealing order, combined with the after-hours filing, the absence of any officially recorded judicial assignment as of the date of signing, and the fact that the executed order first reached the docket annexed to the implementation filing of the Schulte attorney who had drafted it, that the order was signed and implemented outside ordinary motion-practice channels. The proposed order also contained a second decretal providing that, pending the hearing of the Order to Show Cause, "Plaintiff must refrain from filing her Complaint on the docket until after the resolution of this Order to Show Cause." On the signed order, that provision is struck through by hand, with initials adjacent to the deletion. The drafters had thus placed before the Court, in writing, a proposed direction forbidding Plaintiff to file her own complaint; the Court struck that provision and, on the same marked-up paper, entered the docket-wide seal without findings.

27

41.1.  The scope certified on the EF-7 was categorically broader than the signed order's prospective text. The order directed that "any and all documents to be filed in this matter are to be filed under seal." The EF-7 Wolf signed and filed the same evening did not identify documents to be sealed; it certified "Sealing of Entire File Ordered." To the best of Plaintiff's recollection, the documents filed in the action before March 19, 2025 were publicly accessible on NYSCEF. After March 19, 2025, NYSCEF displayed the entire case as sealed: members of the public could see the docket's document headings but could open no underlying filing, and links that had previously permitted access reflected restricted access instead. The restriction thus reached documents already on the docket before March 19, 2025, among them Plaintiff's February 28, 2025 application (NYSCEF Doc. No. 2) and the Schulte Defendants' own March 17, 2025 sealing papers (NYSCEF Doc. Nos. 27–28), none of which the order's prospective language addressed. Whether the restriction of previously filed materials resulted from Wolf's "Entire File" certification, from instructions she received, or from the operational requirements of the NYSCEF system is a matter within Defendants' and court personnel's knowledge, to be established through the system's submission and audit records; what the documentary record establishes is that the implemented scope of the closure was defined by the drafters' own signed notification, which annexed the executed, hand-altered order. NYSCEF Doc. Nos. 42, 44.

42. The sealing order recites only that "sufficient cause being alleged." No findings of compelling need were made on the record. The order was, by its own terms, temporary, limited in effect through the May 16, 2025 hearing. No permanent sealing order was ever entered following that hearing pursuant to 22 NYCRR § 216.1. Notwithstanding the temporary nature of the order, the docket has remained sealed continuously from March 19, 2025 through the date of this filing, over sixteen months.

42.1.   The blanket seal was never necessary to protect Plaintiff, and Plaintiff never supported it; she has opposed it from the beginning. Plaintiff's identity was already protected by an anonymous caption before the sealing application was made, and Plaintiff has litigated to remove the seal since April 2025. No legitimate interest in safeguarding a sexual-assault survivor required concealing every pleading, motion, exhibit, hearing, and ruling from the press and the public: the involuntary public exposure of a rape survivor's identity is a grave and documented harm of its own, and that interest was fully served by the pseudonymous caption, without closing a single page of the docket. Any residual privacy interest could have been protected through targeted redactions, document-specific sealing, or in camera review. What was closed instead was everything, including materials that neither identified Plaintiff nor disclosed anything intimate, while potentially dispositive motions were briefed, argued, and decided outside public view. The gravity of the sealed allegations does not diminish the constitutional presumption of public access; it heightens the need for lawful, narrowly tailored, and publicly accountable judicial process.

## D. The Tisch-Roberts Relationship and Its Late Disclosure

43. On May 7, 2025, Justice Tisch presided over oral argument on Plaintiff's anonymity OSC, the Schulte Sealing OSC, and Plaintiff's motion to disqualify Schulte Roth & Zabel and Friedman Kaplan from joint representation. The transcript of that proceeding is filed as NYSCEF Doc. No. 409.

44. During appearances at that oral argument, Michael J. Roberts identified himself as a litigant. The transcript records:

> MR. ROBERTS: Michael Roberts representing myself.
> THE COURT: Mr. Roberts, I didn't know you were on this case.
> MR. ROBERTS: I try to be anonymous, Your Honor.
> THE COURT: I see.

29

Tr. 5:7-11.

45. On May 9, 2025, Justice Tisch issued a written order recusing himself from the State Action. NYSCEF Doc. No. 268. The Recusal Order states, in relevant part:

> At oral argument held on May 7, 2025 on this motion and motion sequences 001, 002 and 003, the Court recognized one of the litigants appearing on this matter as an individual that the undersigned has a social relationship, albeit infrequently. . . . [T]he Court will nonetheless recuse itself from the action pursuant to 22 NYCRR § 100.3(E)(1) on the basis that it wishes to avoid any potential appearance of impropriety that my impartiality might be questioned because of this relationship . . . .

Recusal Order at 3 (NYSCEF Doc. No. 268).

46. The Recusal Order's reference to "motion sequences 001, 002 and 003" expressly includes Motion Sequence 002, the Schulte Sealing OSC that Justice Tisch had signed on March 19, 2025, and Motion Sequence 003, Plaintiff's motion to disqualify Schulte Roth & Zabel and Friedman Kaplan from conflicted joint representation. The disqualification motion sought to remove the very firms whose partners are connected, through Roberts, to Justice Tisch himself. Justice Tisch presided over and heard oral argument on that disqualification motion on May 7, 2025, and entered and maintained the sealing order in Motion Sequence 002, all while in an undisclosed social relationship with Roberts, a named defendant in the action. His own Recusal Order thus acknowledges that he adjudicated, or sat upon, each of these matters while that relationship remained concealed. Justice Tisch did not disclose his social relationship with Roberts at any point between March 19, 2025, when he signed the sealing order, and May 7, 2025, when Roberts personally appeared at oral argument and the relationship surfaced on the record.

**E. The Roberts–Schulte Connection**

47. Michael J. Roberts is connected by friendship and professional inducement to the partners of Schulte Roth & Zabel LLP, the firm whose attorneys (including Defendants Davis and Wolf) drafted, procured, and operationalized the sealing order. William D. Zabel, founding partner of Schulte Roth & Zabel and a named defendant in the State Action, testified under oath at his deposition on February 13, 2014:

> Q: How did you know Mr. Roberts?
> A: I've known him for many years. He's worked on cases with me and my
> firm. He's a very good friend of some of my partners.

Deposition of William D. Zabel, Feb. 13, 2014, at 51-52.

48. Plaintiff alleges the following sequence of relationships established by the documentary record is therefore: Justice Tisch was in an undisclosed social relationship with Roberts during the period he signed the sealing order; Roberts is, in turn, a documented intimate of multiple Schulte Roth & Zabel partners; and Schulte Roth & Zabel, through Defendants Davis and Wolf, drafted, submitted, hand-delivered, and operationalized the sealing order at issue.

**The Private Defendants Were Not Mere Advocates: They Procured, Implemented, and Operationalized the Seal**

47.1.    The private Defendants' role in the events described above was not that of counsel presenting an application in the ordinary course of advocacy. Defendant Davis was a named defendant in the State Action who sought emergency ex parte relief for his own benefit, filing his Affirmation of Urgency at 7:00 a.m., before court business hours, before any judicial action had been taken on the sealing application, and before the prior justice's recusal had appeared on the docket. Defendant Wolf did not merely argue a motion: she drafted and submitted the proposed sealing order, executed the EF-7 sealing notification that operationalized the seal on NYSCEF, and, upon information and belief, delivered the papers to chambers. The order those acts produced

was signed after business hours, before Justice Tisch was reflected on the docket as the assigned justice, hours after the prior justice's recusal appeared, without a date of signature, without the findings required by 22 NYCRR § 216.1, and with handwritten alterations to the prescribed method of service. The seal then remained in effect after its stated temporary purpose expired, and after the successor judge terminated it. Taken together, these facts support a plausible inference that the private Defendants were not passive beneficiaries of a judicial ruling and did more than ask a court for relief: they jointly participated, with a state officer, in the creation and implementation of the access deprivation. The record confirms the point: at the May 7, 2025 argument, counsel for the Schulte Defendants stated that, with anonymity withdrawn, they saw no reason to seal the case further, yet neither Davis, nor Wolf, nor their firm ever moved to withdraw or dissolve the ex parte seal they had procured. They disclaimed the seal's justification on the record while retaining its benefit. Tr. 8:25–9:2.

47.2.    The Schulte Defendants' written advocacy confirms whose interest the seal served. When Plaintiff sought vacatur of the sealing orders, the Schulte Defendants opposed her request in a written memorandum, arguing that if the Court lifted the Interim Sealing Order, Plaintiff would have "carte blanche to publicly file her Complaint," thereby "humiliating Defendants and permanently impugning their reputations", damage, they argued, that "ultimate dismissal of her outrageous claims cannot undo." NYSCEF Doc. No. 90 at 14. The interest asserted in defense of the seal was thus, in the Schulte Defendants' own words, the reputational interest of the Defendants themselves, including Defendant Davis, who had procured the seal ex parte for, among others, his own benefit, and not any interest of Plaintiff's.

## F. The Seal Was Maintained Solely to Secure a Litigation Advantage

49. Casey Ellen Donnelly, on behalf of nonparty George Soros, appeared at the May 7, 2025 oral argument and affirmatively requested that the seal be continued. The transcript records:

> MS. DONNELLY: Mr. Soros would request that the Court continue to keep the case sealed only for a short period; only until Your Honor decides Mr. Soros' motion to dismiss . . . . [I]f the case is unsealed now, we know what the headlines will be and that is a bell that cannot be unrung.

Tr. 9:6-20.

50. Plaintiff alleges that Donnelly's request, that the seal continue specifically until Soros's motion to dismiss could be decided behind closed doors, demonstrates that the seal's function was to manage publicity, not to protect Plaintiff: public access, she acknowledged, would create "headlines" that Soros wished to avoid.

51. At the May 7, 2025 oral argument, no party other than Soros sought to maintain the seal. Plaintiff stated on the record that she had never requested sealing and that the limited-access designation had resulted from a clerical error in the labeling of a memorandum. Tr. 8. Counsel for the Schulte Defendants stated that, with Plaintiff no longer seeking anonymity, they "don't see a reason to seal the case further." Tr. 8:25–9:2. Counsel for Free Beacon affirmatively opposed continued sealing, arguing that the public has a broad presumption of access to court proceedings regardless of the merits of the claims. Tr. 10-11. The sole party requesting that the seal continue was Soros, through Donnelly, who asked that it be maintained only until Soros's motion to dismiss could be decided, expressly to avoid the "headlines" that public access would generate. Tr. 9, 12.

51.1.   The sole-source nature of the seal's support was confirmed within weeks. Plaintiff moved by emergency order to show cause to unseal the docket and for related relief (NYSCEF Doc. No. 284). Soros, through counsel, opposed the unsealing. The Schulte Defendants' opposition, filed May 27, 2025 over Defendant Wolf's signature, with Defendant Davis listed among counsel, stated expressly that it "only addresses Plaintiff's request for sanctions," taking no

position in support of public access. NYSCEF Doc. No. 340 at 1. Twenty days after telling the Court that there was no reason to seal the case further, the Schulte Defendants thus declined to support unsealing when the question was squarely presented, and, then as always, took no step to withdraw or dissolve the ex parte seal they had procured.

51.2.    The written record confirms the same alignment. Defendant Free Beacon LLC, a media organization named as a defendant in the State Action, filed a memorandum of law on April 25, 2025 opposing any sealing of the docket and requesting that the March 19, 2025 order be promptly sunset. NYSCEF Doc. No. 213. On June 25, 2025, Free Beacon filed a further memorandum opposing Soros's motion to extend the seal, stating that Plaintiff and the Schulte Defendants had withdrawn their sealing requests, "leaving Mr. Soros as the only one of 28 defendants (and the only party) asking for this case to proceed under seal," and that the case had "been sealed in its entirety since the Complaint was filed four months ago without the Court ever making a 'written finding of good cause'" as required by 22 NYCRR § 216.1(a). NYSCEF Doc. No. 393 at 1, 3.

52. Notwithstanding that alignment, Justice Tisch did not lift the seal. At the close of the May 7, 2025 hearing, he stated:

> "[S]ubmit the motions and whatever TROs are in effect remain in effect pending a decision or further action that the Court may take on this matter."

Tr. 40:15-17. Justice Tisch thereafter entered no written order continuing the seal, made no findings under 22 NYCRR § 216.1, and identified no particularized basis for continued sealing. Two days later, on May 9, 2025, Justice Tisch recused himself from the action. NYSCEF Doc. No. 268.

Plaintiff alleges that, notwithstanding the temporary nature of the March 19, 2025 sealing order and the absence of a subsequent order containing findings under 22 NYCRR § 216.1, the docket has remained continuously sealed from March 19, 2025 through the filing of this action. Plaintiff further alleges that, during that period, substantive proceedings continued while the public remained unable to access the docket.

52.1.    A subsequent order confirms the absence of any finding. On May 28, 2025, the successor judge to Justice Tisch signed Soros's order to show cause seeking a temporary extension of the Interim Sealing Order until decision of Soros's motion to dismiss (Motion Sequence No. 015), and set the application for a hearing on July 2, 2025. NYSCEF Doc. No. 377. That order's interim provision recites only that, "sufficient and good cause being alleged, pending the hearing of this Order to Show Cause, the Interim Sealing Order shall continue to be in effect." Id. It made no finding of good cause and specified no grounds under 22 NYCRR § 216.1(a); by its terms, it reserved that question for the hearing it directed. The application's own recital, drafted by Soros's counsel, described the seal as "originally entered at NYSCEF Doc. No. 42" and "extended via oral order of the Court on May 7, 2025", confirming, in the movant's own papers, that no written order continuing the seal followed the May 7, 2025 hearing. Id. The application commenced by that order to show cause was never granted; it was denied as moot on the ground that the action had already been unsealed. NYSCEF Doc. No. 432.

52.2.    Soros's written application repeated and formalized that limitation. His May 22, 2025 memorandum in support of the extension application characterized the requested relief as temporary, asserted that "there is no meaningful harm to the public's or the press's right of access" precisely because the closure would be brief, and assured the court that the media defendants "will ultimately be able to report on everything and anything they wish, thereby preserving their

constitutional freedoms." NYSCEF Doc. No. 316 at 12–13. The endpoint identified was specific: the decision of Soros's motion to dismiss.

**G. The State Trial Court's February 27, 2026 Termination Order and the Continuing Seal**

53. On February 27, 2026, the New York Supreme Court (the successor judge to Justice Tisch) issued its decisions and orders on the pending dispositive motions and, in its Decision and Order on Motion Sequence 011, confirmed that those rulings "terminate[] any temporary sealing in effect in this case", holding Plaintiff's own unsealing motion moot on that ground and terminating the seal. NYSCEF Doc. No. 433 (dated February 27, 2026; entered March 11, 2026). The County Clerk's office subsequently confirmed in writing on the NYSCEF docket that the only remaining step to effectuate unsealing was a direct court directive to the Clerk. NYSCEF Doc. No. 436 (Comment of Frankie Almanzar, March 25, 2026).

54. Notwithstanding the trial court's termination of the seal and the County Clerk's confirmation, the docket has remained sealed. The ongoing official enforcement of the sealed designation continues to confer the benefit of secrecy on those who sought or benefited from closure, while depriving Plaintiff, the press, prospective counsel, and the public of access to the judicial record.

55. Throughout the period the docket has remained sealed, the State Action has not lain dormant. Substantive, potentially case-dispositive proceedings have gone forward entirely behind the seal. One or more motions to dismiss filed by the institutional Defendants have been briefed, argued, and, in at least one instance, decided while the entire docket was closed to the public, the press, and prospective counsel. The public was thereby foreclosed not merely from reviewing static filings but from observing the court adjudicate the very motions capable of terminating Plaintiff's

claims against George Soros, the Trustees of Columbia University, and the other institutional Defendants.

55.1.    Nor is the secrecy a matter of history. As of the date of this filing, the sealed docket is not a static archive but an active forum of substantive adjudication: two fully submitted motions to dismiss (Motion Sequence Nos. 022 and 023, returnable May 5 and May 7, 2026) may be decided on any day, and two applications by defendants in the Underlying State Action to alter the terms of judgments as entered by the Judgment Clerk (Motion Sequence No. 018 and a parallel application; NYSCEF Doc. Nos. 465–466, 474–475) likewise await adjudication, all of it behind a seal the presiding court terminated more than four months ago. The right of access is a right of contemporaneous access. A ruling rendered in secret is not cured by disclosure after the fact: every adjudication entered before public access is restored is a judicial act the public will never have observed, and that injury, once inflicted, no subsequent unsealing can repair. That principle is no longer abstract here: on July 7, 2026, William D. Zabel, a founding partner of Schulte Roth & Zabel and a named defendant in the Underlying State Action, died while court personnel were still enforcing the terminated seal. Time lost to unlawful closure cannot be restored.

56. The seal has also been enforced directly against Plaintiff herself, after its own termination. On July 2, 2025, Plaintiff appeared and argued, pro se, at an oral argument on Motion Sequence Nos. 011 and 015 in the Underlying State Action, held from 8:30 to 9:30 a.m. via Microsoft Teams, at which she argued in support of unsealing. Plaintiff ordered the transcript of that argument from the court reporter and paid the invoiced fee in full on February 27, 2026, the same day the trial court terminated the seal, with delivery agreed within five business days. The transcript was never delivered. On June 1, 2026, more than three months after the termination order, the Office of Court Reporters informed Plaintiff in writing that a court order would be required for delivery because the case was sealed and filed under "Anonymous." When Plaintiff

asked in writing what rule required a court order, none was cited. Plaintiff, a party, and the "Anonymous" in the caption, was directed to seek the transcript of her own hearing by formal motion; a refund was offered, which Plaintiff declined. Plaintiff retains true copies of the transcript-request and refusal correspondence, which will be made available to the Court upon request.

57. The trial court has since confirmed, a second time, that no operative seal exists: it decided Motion Sequence Nos. 011 and 015, the very motions argued on July 2, 2025, as moot because the action had already been unsealed. NYSCEF Doc. Nos. 433 and 432. Court personnel are accordingly enforcing against a party, in mid-2026, a seal that the issuing court has twice confirmed no longer exists, once by terminating it (NYSCEF Doc. No. 433) and again by holding the unsealing motions moot on that very ground. Indeed, Motion Sequence 015 was Soros's own order to show cause to extend the March 19, 2025 seal until his motion to dismiss was decided, the only application ever made to extend the seal, and the court denied it as moot. NYSCEF Doc. No. 432 (dated March 2, 2026; entered March 11, 2026). On March 13, 2026, Soros's counsel served that decision with notice of entry on every party. NYSCEF Doc. No. 443. From that date forward, every Defendant and every counsel of record in the Underlying State Action had formal, documented notice that the seal no longer existed. The docket remained sealed anyway, and eleven weeks later, court personnel refused Plaintiff the transcript of her own hearing on asserted sealing grounds.

57.1. The endpoint Soros's counsel had identified was reached, and then abandoned. Soros's motion to dismiss was granted; the court terminated any temporary sealing; the extension application was denied as moot; and Soros's own counsel served those rulings with notice of entry. Yet on June 18, 2026, fifteen months after the seal issued and more than three months after its termination, Soros, through the same counsel, asked the state court to keep the docket sealed

"either for a further temporary period, until all Defendants' motions to dismiss have been fully adjudicated, or permanently," describing the relief sought as "whether temporary or indefinite." NYSCEF Doc. No. 565 at 1, 9 & n.2. On July 16, 2026, counsel affirmed that whether the docket should remain sealed "is an open issue that is being actively litigated." App. Div. Case No. 2026-04188, NYSCEF Doc. No. 11, ¶ 9. The requested endpoint has moved each time it arrived; the closure has remained. Plaintiff pleads these successive representations as evidence of the interest the seal's continued enforcement serves, not as a claim against any nonparty.

58. The transcript denial inflicted concrete prejudice. Plaintiff was required to brief and file her opposition to a pending motion to dismiss in the Underlying State Action (Motion Sequence 023) on June 3, 2026 without the record of the argument. The withheld transcript also contains Plaintiff's own on-the-record statements concerning threats to her life, described below, which the continued enforcement of the terminated seal keeps out of her hands. Plaintiff does not ask this Court to adjudicate any state-court request for delivery of that transcript. The denial is pleaded here as evidence that, after the state court terminated the seal, court personnel continued to enforce sealed-access restrictions as if the seal remained operative, and as evidence of the concrete injury that ongoing enforcement causes.

## H. Plaintiff's Exhausted State-Court Remedies

59. Plaintiff has pursued every available state-court remedy. In April 2025, she filed an emergency Article 78 / CPLR 5704(a) petition with the Appellate Division, First Department (Index No. 2025-02277). On May 13, 2025, the First Department denied that petition. On July 17, 2025, the First Department denied Plaintiff's motion for clarification.

60. The Appellate Division's July 17, 2025 order itself bears the designation "SEALED" on its face. The appellate forum, in other words, replicated the very access barrier Plaintiff had asked it to remedy.

61. Plaintiff has filed multiple unsealing motions in the trial court, including her Emergency Order to Show Cause with Temporary Restraining Order filed April 27, 2026 (NYSCEF Doc. No. 524). Notwithstanding the trial court's own February 27, 2026 termination of the seal, the Appellate Division's denials, and the County Clerk's written confirmation, the seal remains in effect. At the direction of the trial court's own chambers, Plaintiff has been directed to seek delivery of the paid-for transcript of the July 2, 2025 oral argument, at which she herself appeared and argued, by formal motion, as set forth below.

## I. The Continuing Constitutional Injury

62. The seal has caused Plaintiff concrete, ongoing, and irreparable injury. Plaintiff has been unable to retain counsel because the sealing order prevents prospective counsel from reviewing the docket. On the record at the May 7, 2025 oral argument, Plaintiff stated: "I requested that it was a very famous litigator, one of the most famous in the country. He was a professor at Harvard for 40 years. He refused to look at the papers because of the sealing order. So even if I had told him, he said he could not violate sealing orders." Tr. 29:6-11. A public docket is, in the ordinary course, how counsel locate, evaluate, and undertake cases of this kind: publicity supplies both the reach through which a case finds counsel and the incentive for counsel to accept it, and a sealed docket forecloses both. Prospective counsel who declined representation cited, among their reasons, conflicts of interest arising from the defendants' prominence in the New York legal community and the size and complexity of the litigation.

ALC Document 1 Filed 08/05/26 Page 41 of 70

63. Plaintiff has been forced to litigate complex multi-defendant motion practice as a pro se litigant against twenty-eight or more defense attorneys, across a docket now exceeding 550 entries, without legal research access (Westlaw, Lexis), institutional support, or peer-victim solidarity that ordinarily attach to civil litigation against defendants of this profile. The conditions imposed by the seal have led to citation deficiencies in Plaintiff's filings, citation deficiencies defense counsel have themselves identified as a basis to seek sanctions against Plaintiff. At the May 7, 2025 argument, Plaintiff also stated on the record that Defendant Davis had intimidated her senior paralegal, and that the seal forced her to impose confidentiality undertakings on anyone who assisted her, compounding the burden of litigating without counsel. Tr. 24:2-13, 28:2-8. The mechanism is documented in Defendants' own filings: on April 4, 2025, Defendant Davis sent Plaintiff's senior paralegal, a non-party, a "Preservation Notice" copied to the U.S. Managing Partner of the paralegal's employer, asserting that the paralegal's assistance to Plaintiff "may constitute the unauthorized practice of law", a crime in New York, as the Schulte Defendants' own brief notes, stating that his communications with Plaintiff were not covered by privilege, and reserving "all rights" against him; Defendant Davis's firm had separately contacted the employer's U.S. Managing Partner about him. NYSCEF Doc. No. 340 at 3–5, 8. Plaintiff's senior paralegal thereafter ceased assisting her. The seal that produced the conditions causing the deficiencies and the sanctions request that converts those deficiencies into liability are part of a single causal chain initiated by the sealing order at issue. Plaintiff said as much on the record on May 7, 2025, attributing any citation mistakes to her lack of support and research access. Tr. 24:17-25. Plaintiff's own earliest preservation demand predates the seal itself: on March 18, 2025, she directed Defendants' counsel in writing to preserve all communications, as alleged at paragraph 30.1.

41

64. Plaintiff has been deprived of the public-access dynamics, press scrutiny, prospective counsel attention, peer-victim outreach, settlement pressure, through which civil litigation against institutional defendants ordinarily reaches resolution.

64.1.   The seal's one-way operation is illustrated by the asymmetry between what it suppresses and what it permits. The sworn record supporting Plaintiff's allegations, including deposition testimony and affidavits filed in the Underlying State Action, remains inaccessible to the public behind the seal. Characterizations of Plaintiff, by contrast, appear on a public docket. In an affirmation filed July 16, 2026 on the public docket of Plaintiff's Article 78 proceeding, counsel for Soros, affirming that "I make this Affirmation based on my personal knowledge", swore to a narrative in which Plaintiff has "spent almost two decades pursuing a consistent campaign of harassment," encompassing events that predate the commencement of the Underlying State Action by many years. App. Div. Case No. 2026-04188, NYSCEF Doc. No. 11, ¶¶ 1, 5. Annexed to that public filing as its Exhibit B was Soros's memorandum of law from the sealed docket of the Underlying State Action, which asserts that Plaintiff acted "in furtherance of a bad-faith attempt at extorting a sizable monetary payment" and "as part of an extortion ploy," and which discloses Plaintiff's legal name notwithstanding the anonymous captions of both the Underlying State Action and the Article 78 proceeding itself. Id., Ex. B (NYSCEF Doc. No. 565 in the Underlying State Action), caption and at 2, 5. The seal thus operates to withhold from the public the evidentiary record on which Plaintiff's allegations rest, while the characterizations of Plaintiff advanced by the party whose conduct that record concerns circulate publicly, placed there by the same counsel who opposes unsealing.

65. Plaintiff has suffered, and continues to suffer, professional and reputational injury. She is the founder and CEO of an early-stage technology company and has been required to suspend

professional commitments to manage litigation that the seal has prevented her from outsourcing to retained counsel.

66. The continued enforcement of the seal implicates Plaintiff's safety. At the July 2, 2025 oral argument, Plaintiff stated on the record that she believed her life was in danger; that it would be very convenient for something to happen to her while the case remained sealed and hidden from public view; and that she had previously received death threats, had reported those threats to the Federal Bureau of Investigation, and had annexed her FBI complaints as exhibits to her complaint in the Underlying State Action. Those were not her first such statements: at the May 7, 2025 oral argument, Plaintiff stated on the record that she had received death threats and asked that her address be kept confidential for her security, a request the Court granted. Tr. 4:1-5. Plaintiff continues to fear for her life.

67. Plaintiff's fear is not speculative. It is grounded in the conduct already alleged in this Complaint and in the Underlying State Action: a retaliatory lawsuit engineered to brand her a false accuser, the leak of her identity as a rape survivor to the international press, the deployment of intimate materials as settlement pressure, an ex parte seal procured within hours of her transmitting a draft complaint, and an undisclosed relationship between the presiding justice and a defendant. Public visibility is itself a form of protection: a litigant whose case is open to the press, the public, and prospective counsel is not invisible, and cannot quietly disappear. The seal has stripped that protection away while Plaintiff's own on-record statements concerning threats to her life remain locked behind it. The prospective injunctive relief sought in this action is therefore, in material part, a measure of Plaintiff's physical safety, and each additional day of enforcement compounds an injury that no later award of damages could ever undo.

68. The First Amendment freedoms infringed by the sealing have been infringed continuously for over a year. As the Supreme Court has held, "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373 (1976).

68.1.    The deprivation alleged is not a single completed act with lingering consequences. The closure was created as a docket-wide designation that persists only so long as it is affirmatively administered, and it has been maintained by a continuing course of conduct: the private Defendants opposed its removal in writing when Plaintiff moved to vacate it; they took no step at any time to withdraw or dissolve the closure they had procured, including after their own counsel disclaimed any reason for its continuation and after notice of entry of the termination rulings was served on every party on March 13, 2026; and the designation has been enforced against Plaintiff, the press, and the public on every day since. ¶¶ 47.2, 54, 55.1, 56. Plaintiff alleges that each day on which access has been denied is a discrete and continuing deprivation of the rights alleged, and that each day of enforcement after February 27, 2026, when the court that entered the closure terminated it, is a further and independent deprivation, inflicting injury that accumulates with time and that no later unsealing can repair. The deprivations occurring after February 27, 2026 are alleged as independently actionable acts, each with its own date: they are not the residue of the March 19, 2025 order, because after February 27, 2026 that order supplied no authority for anything. Enforcement continued without it.

## CAUSES OF ACTION

## COUNT I, 42 U.S.C. § 1983, Deprivation of First and Fourteenth Amendment Rights Through Joint Action Under Color of State Law

44

*(Against Defendants McDermott Will & Schulte LLP, Schulte Roth & Zabel LLP, Davis, and Wolf)*

69. Plaintiff incorporates by reference each and every preceding allegation as if fully set forth herein.

70. A private party acts under color of state law for purposes of 42 U.S.C. § 1983 when the party is a willful participant in joint activity with a state official or conspires with a state official to deprive another of rights secured by the Constitution. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982); *Dennis v. Sparks*, 449 U.S. 24 (1980); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970). Although a judge may be entitled to judicial immunity from damages for certain acts, that immunity does not extend to private parties who jointly participate with the judge in unconstitutional conduct. *Dennis*, 449 U.S. at 27–28. An entity, public or private, is not liable under § 1983 on a theory of respondeat superior; it is liable where the deprivation results from its own policy, from the act of an official possessing final decision-making authority for the entity, or from conduct the entity has authorized or ratified. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978); Rojas v. Alexander's Dep't Store, Inc., 924 F.2d 406, 408–09 (2d Cir. 1990). The entity liability of Defendants Schulte Roth & Zabel LLP and McDermott Will & Schulte LLP is pleaded on that basis, as alleged at paragraphs 22.1 through 22.3 above.

71. Plaintiff alleges that Justice Tisch acted under color of state law in entering, implementing, and maintaining the challenged sealing order. Plaintiff's damages claims against the private Defendants are not premised on any alleged conspiracy or agreement with the Clerk; they are premised on the private Defendants' alleged joint action with Justice Tisch, a state judicial officer, in procuring, presenting, implementing, and operationalizing a docket-wide seal without the findings required by law, under circumstances supporting an inference of coordinated action.

45

71.1.    Plaintiff does not rely on labels or conclusions to plead joint action. She alleges an agreement from the coordinated sequence of acts pleaded above: Defendant Davis's 7:00 a.m. ex parte Affirmation of Urgency; Defendant Wolf's preparation of the proposed order and execution of the EF-7 sealing notification; the delivery of the papers to chambers, upon information and belief; the after-hours entry of an undated order before Justice Tisch appeared on the public docket as the assigned justice; the absence of the findings required by law; the undisclosed relationship connecting Justice Tisch to Roberts, and Roberts to Schulte Roth & Zabel partners; Roberts's on-record statement joining in Schulte's motions (Tr. 39:10-11); and the private Defendants' failure to seek dissolution of the ex parte closure even after their own counsel stated on the record that there was no reason to seal the case further (Tr. 8:25–9:2). Taken together, those facts plausibly allege more than ordinary advocacy and more than parallel conduct.

Plaintiff alleges that Defendants Harry S. Davis and Shannon B. Wolf were willful participants in joint activity with Justice Tisch by, among other things:

(a) preparing and submitting the emergency sealing application;

(b) requesting ex parte relief;

(c) preparing the proposed Order to Show Cause;

(d) executing the NYSCEF documents implementing the seal; and

(e) upon information and belief, presenting or causing the sealing papers to be presented to Justice Tisch for signature outside the ordinary assignment process.

71.2.    This Count is not pleaded as a freestanding cause of action for "conspiracy" or "joint action." It is a substantive claim under 42 U.S.C. § 1983 for the deprivation of identified

46

constitutional rights: (i) Plaintiff's First Amendment right of access to judicial proceedings and records, including the docket itself, in an action in which she is the plaintiff, as alleged in Count II and at paragraph 76.1; and (ii) Plaintiff's Fourteenth Amendment right to procedural due process, as alleged in Count III, including the right to notice and an opportunity to be heard before an ex parte docket-wide closure, as alleged at paragraph 83.1. Joint action with Justice Tisch is the basis on which the private Defendants acted under color of state law with respect to those deprivations; it answers § 1983's state-action requirement and is not itself the right sued upon. Nor are the acts pleaded limited to petitioning a court: Defendant Wolf did not only request relief, she executed the EF-7 sealing notification, the administrative instrument that implemented the closure on the NYSCEF system. Implementation is conduct, not advocacy. And as to the scope of the closure actually imposed, the operative determination was not the court's. The signed order spoke prospectively, to documents to be filed. The certification that defined what the Clerk restricted, an entire file, accessible only to the parties, their counsel, and court personnel, was selected, initialed, and filed by Defendant Wolf. ¶¶ 41.1, 24. Plaintiff alleges that in that respect the private Defendants' judgment as to the reach of the restriction was substituted for the judgment of the court whose order they were purporting to implement.

71.3.    The inference of an understanding does not rest on chronology alone; it rests on facts that presuppose communication. On March 19, 2025, no justice was recorded on the docket as assigned to this case. Papers do not select a judge, travel to his chambers, or return signed by themselves. The sealing papers were directed to, received in, and acted upon within the chambers of a particular justice who, as of that evening, had no publicly recorded connection to the case, and the signed order bears handwritten alterations to the prescribed method of service, evidencing direct engagement between the drafters' papers and the signing chambers. Upon information and belief, Defendants Davis and Wolf, or persons acting at their direction, communicated with Justice

47

Tisch's chambers concerning the sealing application before the order was signed and entered. The identity, timing, and content of those communications are facts peculiarly within the knowledge of Defendants and of court personnel, and are properly pleaded on information and belief. See Arista Records LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010). An agreement for purposes of § 1983 may be shown by circumstantial evidence, Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970), and the sequence pleaded here, a 7:00 a.m. ex parte affirmation by a defendant, papers reaching an unassigned justice, a same-day after-hours signature entered before any recorded assignment, and immediate operationalization by the drafters themselves, is the circumstantial signature of arrangement, not coincidence.

71.4.    Nor are the facts pleaded "equally consistent" with routine practice. In the ordinary course, an emergency application is routed through the court's administrative channels to the justice assigned to the case, and counsel's communications with chambers concern a case that chambers has been assigned. Here no assignment appeared on any public record until the following morning. The prior justice's recusal appeared on the docket at 1:01 p.m.; no successor assignment was recorded that day; and that evening the papers had nonetheless reached, and been signed by, a particular justice with no publicly recorded connection to the case, with the drafters filing the implementing notification, executed order annexed, at 6:38 p.m. As of the evening of March 19, 2025, no assignment, rule, order, or docket entry of record identified Justice Tisch as a justice to whom applications in this case could be routed; the order transferring the case to him, though dated that day, was not filed until 10:25 A.M. the following morning, and how the drafters learned of the destination before any public record disclosed it, whether through the clerk's office, through chambers, or otherwise, is a fact peculiarly within the knowledge of Defendants and court personnel, to be established through their records and testimony. The routing of the application to Justice Tisch and its same-day, after-hours signature are therefore not the residue of routine

48

practice; they are affirmative facts whose explanation, who directed the papers to that justice, and by what communication, lies with Defendants and court personnel, not with Plaintiff.

71.5. The object of the accepted communications is evidenced by their product. What emerged from the exchange between the drafters and chambers was not a routine order of a kind courts enter every day: it was a docket-wide closure that New York law did not permit any court to enter without particularized findings, Mosallem v. Berenson, 76 A.D.3d 345, 349 (1st Dep't 2010); Danco Labs., Ltd. v. Chemical Works of Gedeon Richter, Ltd., 274 A.D.2d 1 (1st Dep't 2000), entered before any recorded assignment, bearing no date, and reciting only that cause had been "alleged", and it matched the relief the drafters requested. When joint activity produces a result that no lawful process could have produced, and the result conforms to the private party's request, the shared objective of the participants may be inferred from what they jointly accomplished. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). Plaintiff accordingly pleads the agreement's object from its output: the participants in the accepted communications jointly produced precisely the unlawful closure the application sought.

71.6. Plaintiff pleads the understanding, and its object, from conduct rather than from the words exchanged, because the manner in which the application was presented placed those words beyond her reach. The application was made ex parte, in Plaintiff's absence and without notice to her; upon information and belief the papers were delivered to chambers rather than presented through the ordinary public process; the order was signed and returned after business hours, before the assignment was recorded on the public docket; and no transcript, minute, or docket entry records what passed between the private Defendants and chambers on March 19, 2025. ¶¶ 32, 38, 39, 40, 41. What was communicated, by whom, and on what terms is knowledge peculiarly within Defendants' possession, and Plaintiff's allegations as to the content of those communications are pleaded upon information and belief on the basis of the documentary sequence alleged above.

49

71.7. Plaintiff pleads the element of state action in the alternative, and the alternative does not depend upon proof of an agreement. A private party acts under color of state law when it is a willful participant in joint activity with the State; and joint participation is established where the private party exerted influence over the state actor, where the private party's judgment was substituted for the state actor's, or where the private party participated in the decision that produced the deprivation. Plaintiff alleges each of those things. The application was presented ex parte, outside Plaintiff's presence and without notice of its presentation. The order that issued was the order the private Defendants had drafted, bearing the terms they proposed and omitting the findings the governing rule requires. The scope certified to the County Clerk, an entire file, closed to everyone but the parties, their counsel, and court personnel, was the scope Defendant Wolf selected and initialed. And the closure that resulted was the closure the private Defendants had asked for, which they thereafter declined to withdraw and from which they took the benefit. ¶¶ 24, 32–33, 39–42, 41.1, 47.1–47.2, 71.2. Should the Court conclude that the understanding alleged at paragraphs 71.1 through 71.6 is not sufficiently pleaded, Plaintiff alleges that the state-action element is satisfied on these facts independently of any agreement.

72. Plaintiff alleges that Defendant McDermott Will & Schulte LLP is the successor to Schulte Roth & Zabel LLP and is therefore liable, under applicable principles of successor liability, for the conduct of Schulte Roth & Zabel LLP and its partners alleged in this Complaint. Schulte Roth & Zabel LLP itself remains an existing entity, per its own General Counsel's sworn affirmation, "a subsidiary of McDermott Will & Schulte LLP" that "no longer has any attorneys" (NYSCEF Doc. No. 426 ¶ 7), and is named as a Defendant herein; the entity theories are pleaded in the alternative at paragraphs 22 through 22.4. Plaintiff does not allege that McDermott Will & Schulte LLP itself participated in procuring the challenged order; it did not exist when the order was procured. Its liability in this Count is derivative, and it is coextensive with the liability of

Schulte Roth & Zabel LLP: it reaches every deprivation alleged in this Count without distinction among them, because a successor takes the predecessor's obligations as they stand and not some subset of them. Plaintiff separately alleges that the combined firm adopted and continued the representation, and retained the benefit of the closure, from the merger's effective date forward. ¶¶ 22.1, 22.3, 22.4.

73. Plaintiff alleges that Michael J. Roberts's undisclosed personal relationship with Justice Tisch, and his documented personal and professional connections to Schulte Roth & Zabel partners, are probative circumstantial evidence of the joint action pleaded herein: they evidence an undisclosed relational pathway connecting the justice who signed the sealing order and the firm whose partners drafted, submitted, delivered, and operationalized it. Plaintiff seeks no damages from Roberts in this action. Plaintiff alleges that those relationships, together with the coordinated conduct and chronology described above, support the inference of an understanding between the private Defendants and Justice Tisch. Plaintiff does not allege that Roberts's relationship, standing alone, proves an agreement; she alleges it as one fact within a broader chronology supporting a plausible inference of coordinated conduct. That chronology includes Roberts's own conduct at the May 7, 2025 argument, where he appeared pro se and, during the argument on Plaintiff's disqualification motion, stated on the record: "I'd also like to join in Schulte's motions for the reasons stated." Tr. 39:10-11.

Plaintiff alleges that the private Defendants reached an understanding with Justice Tisch to accomplish the challenged deprivation of Plaintiff's constitutional rights and that each Defendant knowingly participated in conduct designed to procure, implement, or operationalize the challenged sealing order.

51

74. Plaintiff alleges that, by virtue of their joint participation with Justice Tisch, the private Defendants acted under color of state law and are subject to liability under 42 U.S.C. § 1983. As a direct and proximate result of that conduct, Plaintiff has suffered the constitutional injuries and damages alleged herein and seeks compensatory and punitive damages to the extent permitted by law. Punitive damages are warranted: Plaintiff alleges that the private Defendants acted with reckless or callous indifference to her federally protected rights, if not with actual malice, in procuring an ex parte seal within hours of receiving her draft complaint, operationalizing it without the findings required by law, producing a closure that persisted even after the court that issued it had terminated it. Smith v. Wade, 461 U.S. 30, 56 (1983). The conduct alleged was not negligent; it was deliberate and strategic, undertaken in reckless disregard of Plaintiff's federal rights of access and fair process. Any conceivable doubt ended on March 13, 2026, when notice of entry of the mootness rulings was served on every party (NYSCEF Doc. No. 443); the enforcement, and Defendants' benefit from it, continued regardless.

Plaintiff further alleges that the chronology of events, including the transmission of Plaintiff's draft complaint, the emergency request for ex parte sealing relief the following morning, the entry of the sealing order immediately following the recusal of the previously assigned justice, and the continued maintenance of the seal despite repeated requests for public access, supports the inference of coordinated action among the Defendants.

74.1.   As a direct and proximate result of the conduct alleged in this Complaint, Plaintiff has suffered, and continues to suffer: (a) the continuing deprivation of rights secured by the First and Fourteenth Amendments; (b) the loss of the opportunity to retain counsel and the resulting burden of litigating a complex, multi-defendant action pro se against twenty-eight or more defense attorneys; (c) professional and business injury, including the suspension of professional commitments as the founder and chief executive of an early-stage technology company; (d)

52

reputational injury, compounded by the suppression of the very record that would have answered the public "false accuser" narrative; (e) emotional distress; (f) litigation-related costs and burdens; and (g) increased risk to Plaintiff's safety caused by the public invisibility of proceedings in which she stated on the record that she feared for her life. Plaintiff seeks compensatory damages for each of these injuries, and punitive damages, in amounts to be determined at trial.

74.2.    Plaintiff's damages are pleaded in two periods, with distinct causal chains. For the period from March 19, 2025 through February 27, 2026, Plaintiff's injuries were caused directly by the seal the private Defendants procured, implemented, and operationalized. For the period after February 27, 2026, Plaintiff does not allege that any private Defendant controlled the Clerk, directed court personnel, or reached any agreement with either; she alleges that the continued enforcement of the closure was the foreseeable and proximate consequence of the manner in which the private Defendants created it: an ex parte, docket-wide seal entered without the findings required by law and without any mechanism for its own unwinding, operationalized on the NYSCEF system by Defendant Wolf's execution of the EF-7 notification, and never withdrawn or corrected by its procurers, even after their own counsel disclaimed any reason for continued sealing on the record (Tr. 8:25–9:2), and even after notice of entry of the termination rulings was served on every party on March 13, 2026 (NYSCEF Doc. No. 443). A party that unlawfully creates a condition is answerable for the foreseeable persistence of the condition it created. The persistence of this closure in the hands of administering personnel was not merely foreseeable; it was the predictable operation of the very instrument the private Defendants designed and executed.

74.3.    No subsequent judicial act severs the causal chain alleged above. The private Defendants never disclosed to any court asked to maintain the closure, or to any court that inherited it, how the original order had been procured: that the application was presented ex parte at 7:00 A.M. on the morning after Plaintiff transmitted her draft complaint; that the order was signed

without any of the findings the governing rule requires; or that the EF-7 notification Defendant Wolf executed certified a scope broader than the order she had submitted. ¶¶ 32, 41.1, 42. That order was the standing predicate on which every later continuation of the closure rested, and its defects were never placed before any judge asked to act upon it. Nor did the private Defendants stand silent while others maintained what they had created: when Plaintiff moved to vacate the closure, they opposed her in writing and invoked the reputational interests of the Defendants themselves. ¶ 47.2. Plaintiff alleges that the continuation of the closure was at all times the foreseeable consequence of the manner of its creation, and that no later order rested on an informed and independent assessment of the facts alleged in this Complaint.

### COUNT II, 42 U.S.C. § 1983, Violation of First Amendment Right of Access to Judicial Proceedings
*(Against Defendant Clerk of the County of New York, in an Official Capacity, for Declaratory and Injunctive Relief Only)*

75. Plaintiff incorporates by reference each and every preceding allegation as if fully set forth herein.

76. The First Amendment to the United States Constitution guarantees the public and the press a qualified right of access to civil judicial proceedings and to the judicial documents and docket sheets that record them. *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1 (1986); *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83 (2d Cir. 2004); *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006). Restrictions on that right must be narrowly tailored to serve a compelling interest and must be supported by specific, on-the-record findings.

76.1.   The right of access includes access to docket sheets and to the judicial records necessary for the public to understand what a court is doing. Hartford Courant Co. v. Pellegrino,

380 F.3d 83, 93 (2d Cir. 2004). A right to attend proceedings is illusory if the public cannot learn that a case exists, what motions are pending, what orders have been entered, or what judicial action has occurred. Here, the entire docket was closed while dispositive motions were briefed, argued, and, in at least one instance, decided. That is the precise injury the right of access exists to prevent.

77. Plaintiff alleges that Justice Tisch's March 19, 2025 sealing order was entered without the particularized findings required by 22 NYCRR § 216.1, reciting only that "sufficient cause being alleged." Plaintiff further alleges that the temporary sealing order remained in effect for more than sixteen months notwithstanding the absence of any subsequent permanent sealing order supported by findings under 22 NYCRR § 216.1 and despite the state trial court's February 27, 2026 order terminating the seal.

Plaintiff further alleges that the emergency sealing application was based principally on the concern that Plaintiff might publicly file her Complaint before the Court ruled on the sealing request. Plaintiff alleges that preventing a litigant from filing a civil complaint on the public docket, standing alone, is not a compelling governmental interest sufficient to overcome the First Amendment presumption of public access or to satisfy the particularized findings required by 22 NYCRR § 216.1.

78. Plaintiff alleges that the only interest articulated in support of maintaining the seal was the desire to avoid public "headlines" concerning a prominent litigant. During the May 7, 2025 hearing, counsel requesting continuation of the seal asked that it remain in effect until dispositive motions could be decided, expressly referring to the "headlines" that public access would generate. The desire to shield a litigant from publicity, embarrassment, or reputational harm is not a compelling interest sufficient to overcome the First Amendment presumption of access. *Mosallem*

*v. Berenson*, 76 A.D.3d 345, 351 (1st Dep't 2010); *Danco Labs., Ltd. v. Chemical Works of Gedeon Richter, Ltd.*, 274 A.D.2d 1, 8 (1st Dep't 2000).

78.1.    Nor was the seal narrowly tailored, or tailored at all. Plaintiff's identity was already protected by the anonymous caption in place before the seal was sought. Intimate materials could have been protected by targeted redactions or document-specific sealing; genuinely sensitive exhibits could have been reviewed in camera. None of that required closing an entire civil docket, hiding every filing, concealing every motion, and allowing dispositive proceedings involving prominent litigants to occur outside public view. The blanket seal was the broadest possible restriction, not the least restrictive means. As alleged, it did not protect Plaintiff from exposure; it protected those accused in the Underlying State Action from accountability.

Plaintiff further alleges that the challenged seal remained in effect while substantive motions were briefed, argued, and, in at least one instance, decided outside public view. The First Amendment presumption of public access is at its strongest with respect to judicial documents filed in connection with dispositive motions. *Lugosch*, 435 F.3d at 121.

79. The challenged seal is a creature of the State. It was entered under color of state law, it is administered on the State's electronic filing system by a state official, and its continued enforcement is, day by day, ongoing state action. Plaintiff alleges that this enforcement deprives Plaintiff and the public alike of the qualified First Amendment right of access to judicial proceedings and judicial records, a deprivation that renews with each day the docket remains closed.

80. Plaintiff seeks a declaration that the continued maintenance and enforcement of the challenged seal violates the First Amendment and an injunction directing the unsealing of the docket. Plaintiff further alleges that prospective injunctive relief is authorized under 42 U.S.C. §

1983 because declaratory relief available through the state-court process has proven unavailable to remedy the ongoing constitutional injury alleged herein.

81. Defendant Clerk of the County of New York is named solely in an official capacity for prospective injunctive relief. Plaintiff alleges that the Clerk possesses the ministerial authority necessary to implement any order directing that the challenged seal be lifted. Plaintiff seeks no damages against the Clerk.

As a direct and proximate result of the continued enforcement of the challenged sealing order, Plaintiff alleges that she has been deprived of her First Amendment right of access, impeded in her ability to obtain counsel and litigate the Underlying State Action, and subjected to ongoing constitutional injury for which declaratory and prospective injunctive relief are necessary and appropriate. That injury includes the denial to Plaintiff, on asserted sealing grounds and after the seal's own termination, of the transcript of the July 2, 2025 hearing at which she appeared and argued.

## COUNT III, 42 U.S.C. § 1983, Violation of Procedural Due Process
### *(Against Defendants McDermott Will & Schulte LLP, Schulte Roth & Zabel LLP, Harry S. Davis, and Shannon B. Wolf, Joint Action Under Color of State Law)*

82. Plaintiff incorporates by reference each and every preceding allegation as if fully set forth herein.

83. The Due Process Clause of the Fourteenth Amendment guarantees litigants the right to a fair proceeding before a neutral and impartial decisionmaker. *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009).

Plaintiff alleges that Justice Tisch presided over and determined the application for the challenged sealing order while maintaining an undisclosed personal relationship with Michael J. Roberts, who was himself a named defendant in the Underlying State Action. Plaintiff further alleges that the existence of that relationship was not disclosed until after the challenged order had been entered and remained in effect.

83.1.    Plaintiff's procedural due process claim does not rest on the undisclosed relationship alone. Procedural due process requires, at a minimum, notice and an opportunity to be heard before the state effects a significant deprivation, except in extraordinary circumstances justified by findings and followed by a prompt post-deprivation hearing. Fuentes v. Shevin, 407 U.S. 67, 80–82 (1972); Mathews v. Eldridge, 424 U.S. 319, 333 (1976). Plaintiff received no hearing and no notice of when or where the application would be presented for signature: although the Schulte Defendants transmitted their application papers to Plaintiff, the docket-wide closure was sought and entered ex parte, on the application of a named defendant, without Plaintiff being heard, without the findings required by law, and without any prompt adjudication of its justification thereafter, the hearing pending which the seal was expressly limited produced no findings, and the closure persisted for more than sixteen months, surviving even the order that terminated it. That deprivation, of notice, of findings, and of a prompt hearing, is complete regardless of whether the assigned justice's undisclosed relationship independently violated the Due Process Clause under Caperton. The internal allocation of authority within the partnership, its partnership agreement, its committee structure and delegations, and its decision-making practices, is peculiarly within Defendants' knowledge. Plaintiff pleads the external facts available to her: the firm acted through its General Counsel and through its counsel of record; no organ of the firm ever disavowed or corrected those acts; and the firm continued to appear, and to defend the seal's continuation, through the same actors. See Arista Records LLC v. Doe 3, 604 F.3d 110, 120 (2d

Cir. 2010). Nor is this procedural claim displaced by the First Amendment: the more-specific-provision rule of Albright v. Oliver, 510 U.S. 266, 273 (1994), channels substantive due process claims to explicit textual guarantees; it does not extinguish a procedural due process claim, which vindicates the distinct guarantee of notice and a hearing, separate from the access injury pleaded in Count II.

84. Plaintiff further alleges that the proceedings leading to the entry of the challenged sealing order were marked by multiple procedural irregularities, including:

(a) an ex parte application submitted at approximately 7:00 a.m. by a named defendant;

(b) the absence of any publicly reflected judicial assignment at the time the order was allegedly presented for signature;

(c) the presentation of the sealing papers to Justice Tisch's chambers outside the ordinary motion-assignment process, upon information and belief;

(d) entry of the sealing order after normal court business hours;

(e) the absence of a date on the signed order;

(f) the subsequent nondisclosure of Justice Tisch's relationship with Roberts during the period in which the seal remained in effect;

(g) the continued enforcement of the seal for more than sixteen months without the findings ordinarily required by 22 NYCRR § 216.1; and

(h) the entry of an order directing defendants, including the very law firm whose partners had procured the seal, to brief whether the Court should continue presiding over the

matter, rather than an independent judicial determination of the disqualification motion; Plaintiff objected on the record that no judge should ask a defendant whether he should be disqualified. Tr. 40:2-11.

Plaintiff alleges that these circumstances, considered collectively, deprived Plaintiff of the fair and impartial process guaranteed by the Due Process Clause of the Fourteenth Amendment. Plaintiff further alleges that Defendants McDermott Will & Schulte LLP, Schulte Roth & Zabel LLP, Davis, and Wolf jointly participated with Justice Tisch, under color of state law, in creating and exploiting each of these defects, they characterized as an emergency the prospect that Plaintiff would file her complaint on the public docket, though Plaintiff already had anonymity protection and any legitimate privacy concern could have been addressed through targeted redactions, drafted the proposed order, delivered the papers to chambers, executed the sealing notification, and thereafter benefited from the resulting closure, and are liable under 42 U.S.C. § 1983 for the deprivation of fair process those defects produced. A private party who corruptly conspires or jointly participates with a judicial officer acts under color of state law and enjoys no derivative judicial immunity. Dennis v. Sparks, 449 U.S. 24, 27–29 (1980).

As a direct and proximate result of the foregoing, Plaintiff alleges that she has suffered continuing constitutional injury, including the continued enforcement of the challenged sealing order and the deprivation of procedural protections guaranteed by the Fourteenth Amendment.

**COUNT IV, 42 U.S.C. § 1985(2), Conspiracy to Obstruct Justice**
*(Against Defendants McDermott Will & Schulte LLP, Schulte Roth & Zabel LLP, Davis, and Wolf)*

85. Plaintiff incorporates by reference each and every preceding allegation as if fully set forth herein. Plaintiff pleads this Count and Count V in the alternative to her claims under 42

U.S.C. § 1983; those claims do not depend on proof of class-based animus, but on the ongoing deprivation of public access and fair process under color of state law. The agreement alleged in this Count and in Count V is alleged among the private Defendants and Justice Tisch; Plaintiff does not allege that the County Clerk or NYSCEF personnel entered any agreement, their role, as alleged, was the ministerial implementation through which the closure became effective.

86. The second clause of **42 U.S.C. § 1985(2)** prohibits two or more persons from conspiring to impede, hinder, obstruct, or defeat the due course of justice in a state court with the intent to deny any citizen the equal protection of the laws. To state a claim under this provision, Plaintiff alleges that Defendants entered into an agreement to obstruct state judicial proceedings and that the conspiracy was motivated, at least in part, by class-based, invidiously discriminatory animus. *Kush v. Rutledge*, 460 U.S. 719 (1983); *Griffin v. Breckenridge*, 403 U.S. 88 (1971).

86.1. Plaintiff alleges that the conspiracy described herein was motivated, at least in part, by class-based, invidiously discriminatory animus directed toward Plaintiff because of her sex: a woman whose sexual assault became the subject of an institutional report and who was then publicly cast, through a gendered trope, as a woman who had falsely reported rape. The conspiracy did not merely target Plaintiff as an adverse litigant; it targeted the legal and social significance of her status as a woman so cast. As alleged above, the retaliatory campaign deployed a gendered trope historically directed at women who report rape: that Plaintiff was unstable, dishonest, vindictive, and a false accuser who had "cried rape." The sealing application incorporated that trope. Defendant Davis's sworn affirmation attacked Plaintiff as "a person of dubious credibility, with a history of abusing the court system," while the seal it procured suppressed from public view the very documents showing that Columbia University personnel, not Plaintiff, initiated the report

of her rape. A participant in the alleged conspiracy had previously represented the plaintiff in the retaliatory lawsuit accusing Plaintiff of having falsely "cried rape." The object, as alleged, was to silence the record that contradicted the false-accuser narrative while preserving the reputational protection of the men and institutions accused of exploiting it. Suppressing a woman's documented account of sexual violence by means of a trope directed at women as a class is discrimination directed at Plaintiff because of her sex. The object was therefore not simply privacy or case management; it was to deprive that woman, cast as a false accuser of an assault she never herself reported, of equal access to the public judicial process while protecting the men and institutions accused of exploiting the false-accuser trope.

87. Plaintiff alleges that Defendants McDermott Will & Schulte LLP, Schulte Roth & Zabel LLP, Harry S. Davis, and Shannon B. Wolf reached an agreement, acted in concert with Justice Tisch, and undertook coordinated acts to procure and operationalize the challenged sealing order. Plaintiff relies, among other things, upon:

(a) Defendant Davis's emergency affirmation requesting ex parte relief;

(b) Defendant Wolf's preparation of the proposed sealing order and execution of the NYSCEF sealing documents;

(c) the timing of the sealing order's issuance immediately following the recusal of the previously assigned justice;

(d) the alleged undisclosed relationship between Justice Tisch and Roberts; and

(e) the subsequent maintenance of the seal despite repeated applications seeking public access.

In furtherance of the alleged conspiracy, Defendants committed overt acts including submitting the emergency sealing application, preparing and filing the proposed sealing order, implementing the seal on the NYSCEF system, and taking no step to withdraw or dissolve the ex parte closure they had procured, which persisted through the briefing and decision of dispositive motions.

87.1.    The conspiracy alleged in this Count is not an agreement among employees or agents of a single entity, and the intracorporate conspiracy doctrine has no application to it. First, the alleged conspiracy extended beyond McDermott Will & Schulte LLP and its predecessor Schulte Roth & Zabel LLP: it included Justice Tisch, a state judicial officer who was never an employee or agent of either firm. An agreement between a firm's attorneys and a state officer outside the firm is an agreement among separate legal actors. Second, Defendant Davis did not act solely as an attorney within the scope of his employment. He was a personally named defendant in the Underlying State Action who sought emergency ex parte relief suppressing from public view the allegations against him personally; in procuring the seal he pursued an independent personal stake distinct from the firm's representation of its clients, and he is therefore a separate conspirator in his own right. Either circumstance independently defeats any contention that the alleged conspiracy was the act of a single entity.

88. Plaintiff alleges that one purpose of the conspiracy was to impede the due course of justice in the Underlying State Action by preventing public access to judicial proceedings, impairing Plaintiff's ability to obtain counsel, restricting public scrutiny of the litigation, and denying Plaintiff the equal protection of laws governing public judicial proceedings.

88.1.    The obstruction alleged is obstruction of the judicial proceeding itself, and not of publicity alone. The closure operated on the machinery by which the Underlying State Action is

63

litigated and decided: motions capable of terminating Plaintiff's claims have been briefed, argued, and in at least one instance decided while the entire docket was closed to the public and the press; Plaintiff was refused the transcript of her own hearing and was directed to obtain by formal motion what a party ordinarily receives on request; attorneys who might have appeared for her could not examine the record on which any representation would depend; and further dispositive applications remain pending behind the same closure as of this filing. ¶¶ 55, 55.1, 56, 58, 62. Plaintiff alleges that the impairment of the proceeding was the closure's operation and not an incidental byproduct of it.

89. As a direct and proximate result of the foregoing alleged conspiracy, Plaintiff has suffered the injuries described above, including the continuing deprivation of constitutional rights, litigation-related harm, and other damages to be determined at trial.

## COUNT V, 42 U.S.C. § 1985(3), Conspiracy to Deprive Equal Protection
### (Against Defendants McDermott Will & Schulte LLP, Schulte Roth & Zabel LLP, Davis, and Wolf)

90. Plaintiff incorporates by reference each and every preceding allegation as if fully set forth herein.

91. Section 1985(3) prohibits two or more persons from conspiring to deprive, directly or indirectly, any person or class of persons of the equal protection of the laws or of the equal privileges and immunities secured by law. To state a claim under this provision, Plaintiff alleges that Defendants entered into a conspiracy motivated, at least in part, by class-based, invidiously discriminatory animus directed toward Plaintiff as a member of a protected class. *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971).

91.1. Plaintiff alleges that she is a woman and a survivor of gender-based violence. The Underlying State Action alleged that her reported rape, intimate images, and identity as a rape survivor were repeatedly used as instruments of coercion, retaliation, and intimidation. Plaintiff alleges that the discrimination described herein was directed toward her because of her sex and because she reported gender-based violence. The class Plaintiff alleges is women, a class defined by an immutable characteristic, and not by any conduct Defendants disfavor. Plaintiff's status as a woman who reported, and was reported to have suffered, sexual violence is alleged not as the definition of the class but as the occasion on which the animus toward that class was expressed and as the form its expression took.

91.2.   Plaintiff realleges paragraph 86.1. The conspiracy described herein was motivated, at least in part, by invidiously discriminatory animus directed toward Plaintiff because of her sex: a woman whose assault was reported by others and who was publicly cast as having falsely reported rape. The false-accuser trope deployed against Plaintiff is a gendered instrument historically directed at women as a class; the sealing application invoked that trope while suppressing the documents that refuted it; and the seal's alleged function was to protect the accused men and institutions from public scrutiny while silencing the woman who accused them. Plaintiff bases these allegations upon, among other things, the retaliatory litigation described above, the content of the sealing application, the procurement and maintenance of the challenged sealing order, and the suppression of Plaintiff's account of sexual violence while those accused of wrongdoing were shielded from public scrutiny.

91.3.   Plaintiff realleges paragraphs 35 and 35.1 through 35.4. The animus alleged in this Count is evidenced by Defendants' own contemporaneous statements, made in the papers that procured the challenged seal and in the papers opposing Plaintiff's anonymity in the sealed action. In those papers, Defendants placed the word "legitimate" in quotation marks when describing a

woman's claims of gender-based violence; described the pseudonym Plaintiff sought as one "ordinarily reserved for plaintiffs who truly fear for their own physical safety"; swore that competent legal work filed by a woman proceeding pro se reflected "counsel hiding behind her"; and assembled and filed a curated collection of tabloid characterizations of Plaintiff, "Brazilian bombshell," "Fiery Girlfriend," "ex-mistress", in opposition to her request to litigate her account of sexual violence without publicly bearing her name. Plaintiff alleges that each of these instruments is gendered: the presumptively illegitimate female accuser, the woman to whom competent legal work cannot be credited, and the mercenary former companion are characterizations that attach to Plaintiff as a woman and have no counterpart directed at men. Plaintiff further alleges that Defendants' selection of these instruments, contemporaneous with the overt acts alleged in furtherance of the conspiracy, evidences that the conspiracy was motivated, at least in part, by class-based, invidiously discriminatory animus toward Plaintiff because of her sex. As alleged, the gendered means were not incidental to the objective; they were the mechanism by which it was pursued.

91.4.    The animus alleged is connected to the agreement alleged. The gendered characterizations pleaded above were not collateral commentary in unrelated papers: they appear in the very application papers on which the ex parte seal was sought and granted. The memorandum supporting the Schulte Sealing OSC placed "legitimate" in quotation marks in describing a woman's claims of gender-based violence and described the pseudonym Plaintiff sought as reserved for plaintiffs who "truly fear" for their safety, and the relief sought on those papers was granted. ¶¶ 35.1, 39, 42. Plaintiff does not allege that every use of demeaning rhetoric in litigation violates § 1985. She alleges that the instrument of the conspiracy was gendered, that the application's stated predicate was gendered, and that the seal's operation divided the parties along

the very line the false-accuser trope draws: the woman cast as a false accuser was silenced, and those she accused were shielded.

92. Plaintiff alleges that one purpose of the conspiracy was to deny Plaintiff the equal protection of laws governing public judicial proceedings by restricting public access to the Underlying State Action while affording institutional defendants protection from the public scrutiny that ordinarily accompanies civil litigation.

In furtherance of the conspiracy, Defendants allegedly submitted the emergency sealing application, procured entry of the challenged sealing order, implemented and operationalized the seal on the NYSCEF system, took no step to withdraw or dissolve the closure they had procured, and thereby deprived Plaintiff of the equal protection and equal privileges guaranteed by federal law.

92.1.    The deprivation alleged is the denial of an equal benefit of the laws, and not merely an unfavorable ruling. The laws governing public proceedings extend to civil litigants generally the benefit of an open docket: the presumption that the pleadings, motions, exhibits, and orders in a litigant's own case are available to the public, to the press, and to prospective counsel, and that the presumption yields only upon findings made on the record. Plaintiff alleges that she was denied that benefit in full and without those findings, upon an application whose stated predicate was her reported sexual assault; that the same closure conferred upon those she had accused the protection from public scrutiny that the withheld findings exist to justify; and that the closure therefore operated asymmetrically along the very line the alleged animus draws, silencing the woman who accused, and shielding those she accused. ¶¶ 64.1, 78.1.

93. As a direct and proximate result of the foregoing alleged conspiracy, Plaintiff has suffered the injuries described above, including the deprivation of constitutional rights, impairment

of her ability to obtain counsel and prosecute the Underlying State Action, emotional distress, litigation-related harm, and other damages to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants as follows:

A. Declaring that the continued maintenance and enforcement of the seal in *Anonymous v. George Soros, et al.*, N.Y. Sup. Ct., N.Y. Cnty., Index No. 152536/2025, from and after the state trial court's February 27, 2026 order terminating the seal, violates Plaintiff's rights, and the public's rights, under the First and Fourteenth Amendments to the United States Constitution;

B. Issuing temporary, preliminary, and permanent injunctive relief directing Defendant Clerk of the County of New York to effectuate the immediate unsealing of the docket in the Underlying State Action and to implement any further ministerial acts necessary, without staying the Underlying State Action, supervising its merits, or otherwise interfering with its adjudication, to give effect to the state trial court's February 27, 2026 order terminating the seal;

C. Awarding compensatory damages against Defendants McDermott Will & Schulte LLP, Schulte Roth & Zabel LLP, Harry S. Davis, and Shannon B. Wolf, jointly and severally where authorized by law, in an amount to be determined at trial;

D. Awarding punitive damages against the individual private Defendants, Harry S. Davis and Shannon B. Wolf, to the extent permitted by law, in an amount to be determined at trial;

E.    Awarding Plaintiff nominal damages, to the extent appropriate, for the violation of her constitutional rights;

F.    Awarding Plaintiff her litigation expenses and costs pursuant to 42 U.S.C. § 1988 and any other applicable provision of law, and her reasonable attorneys' fees in the event she is represented by counsel;

G.    Awarding pre-judgment and post-judgment interest as permitted by law;

H.    Granting such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims so triable.

Dated: August 5, 2026

Respectfully submitted,

/s/ Anonymous
ANONYMOUS
598 Fifth Avenue, Suite 805
New York, NY 10036
Tel: (504) 600-1188
anonymous.plaintiff123@gmail.com
*Pro Se Plaintiff*

## VERIFICATION

I, the Plaintiff herein, proceeding under a pseudonym, declare under penalty of perjury under the laws of the United States of America that the foregoing factual allegations are true and correct to the best of my knowledge, information, and belief, and that allegations made on information and belief are stated as such.

Executed on August 5, 2026.

/s/ Anonymous
_____
Anonymous

70